## NEW YORK LIFE INS. CO. v. GROW.

No. 6488. Decided March 24, 1943. (135 P. 2d 120.)

*Critchlow & Critchlow,* of Salt Lake City, for appellant.

*Thatcher & Young,* of Ogden, for respondent.

MOFFAT, Justice.

Appeal by the New York Life Insurance Company, plaintiff below, from a judgment in favor of defendant for the face value of a policy of insurance issued on the life of Eldon A. Grow, at age 26, in which the defendant, his wife, was named as beneficiary. The policy was issued and dated September 5, 1939, and delivered to the insured on or about September 9, 1939. The insured died July 3, 1941, from an attack of acute congestive heart failure. His beneficiary

filed with the Insurance Company proof of death and demanded payment of the face value of the policy. Plaintiff refused payment, tendered to the defendant its check for $58.37, representing all premiums paid on the policy and interest thereon from the respective dates of payment, and filed this action August 25, 1941, to cancel the policy, commencing the action prior to the lapse of the two-year period under a clause of the contract providing that "This Policy shall be incontestable after two years from its date of issue except for non-payment of premiums."

Plaintiff alleges that on August 28, 1939, Eldon A. Grow made a written application to plaintiff for a policy of insurance upon his life in the sum of $1,000, designating therein his wife, the defendant, as beneficiary;

"That in said written application said deceased made certain representations and answered certain questions propounded to him on the application form with respect to his health, past and present, whether he had had any sickness or accidents or had consulted or been treated by any physicians or practitioners for any ailments or diseases, and concerning other matters material to the risk which the plaintiff was asked to assume in issuing a policy of insurance upon the life of said deceased and which were necessary in order to enable the plaintiff to decide whether or not said deceased was in good health and a person upon whose life plaintiff would be willing to issue a policy of insurance. That among said statements, representations and answers made by said deceased in said application for insurance were the following:

"(a) To the question: 'Have you within the past five years been continuously and are you now in good health?' said deceased answered, 'Yes.'

"(b) To the question: 'Have you ever changed your occupation or place of residence on account of your health?' said deceased answered, 'No.'

"(c) To the question: 'Have you now, or have you ever had, or ever been told that you had tuberculosis of the lungs or other part of the body, spitting of blood, high blood pressure, *heart trouble*, kidney trouble, diabetes, disease of brain or nervous system, paralysis, epilepsy, syphilis, cancer or tumor, stomach or intestinal ulcer?' said deceased answered, 'No.' [Italics ours.]

"(d) To the question: 'Have you ever undergone any operation, or have you ever been under observation or treatment in any hospital or sanitarium?' said deceased answered, 'No.'

"(e) To the question: 'Have you ever made claim for insurance or compensation on account of any sickness or accident?' said deceased answered, 'No.'

"(f) To the question: 'Have you lost any time from work through illness during the last five years?' said deceased answered, 'No.'

"(g) To the question in said application form to state each ailment, disease, impaired condition of body or mind, surgical operation or injury which the deceased had had within the five years prior to the date of said application, to wit August 28, 1939, and the name of every physician or practitioner, if any, whom he had consulted or who had treated him, and if none to so state, the said deceased stated, 'None' and thereby represented to said plaintiff that he had had during said period no ailment, disease, impaired condition of body or mind, surgical operation or injury, and that he had not consulted or been treated by any physician or practitioner during said period.

"(h) To the question: 'What physicians or practitioners, if any, not named above have you consulted or been examined or treated by within the past five years?' the said deceased answered, 'None.'

"4. That in said application said deceased stated and declared that he had carefully read each and all of the answers made by him as aforesaid and that they and each of them were as made by him, and that each of them was full, complete and true, and that he agreed that the plaintiff company, believing them to be true, should rely and act upon them.

"5. That after said application had been signed by said deceased, the said application, including the statements, representations and answers referred to in paragraphs 3 and 4 hereof, was delivered to the plaintiff and the plaintiff believed that all of said answers, statements and representations were true, and in reliance thereon and not otherwise thereafter executed and delivered a policy of insurance upon the life of said deceased in the sum of $1,000.00. In said policy of insurance the defendant Beverly A. Grow was and is named as the beneficiary thereof and is the person to whom the face amount of said policy should be paid upon the death of said deceased during the lifetime of said defendant. That said policy is dated September 5, 1939, and shortly thereafter was delivered to said deceased."

Plaintiff then alleges that Eldon A. Grow died July 3, 1941, and that defendant filed proof of death and demand on plaintiff for payment. It is then further alleged:

"8. Following receipt of said proof of death plaintiff made an investigation as to the cause of the death of said deceased and as to his physical condition and ailments from which he may have been suffering prior to his death. As a result of such investigation plaintiff was informed and upon information and belief alleges that the statements, answers and representations made by said deceased in his said application for insurance as set forth in paragraph 3 hereof, and each thereof, were false and untrue. In this connection plaintiff alleges upon information and belief that at the time of the signing of said application and for a long time prior thereto the said deceased's heart was seriously affected and that said deceased was then and for a long time previous thereto had been suffering from a serious heart disease, to wit chronic rheumatic heart disease; that prior to May 26, 1936, the occupation of said deceased had been that of a laborer and that following an accident which occurred on or about the 26th day of May, 1936, the deceased changed his occupation to that of a farmer, and that said change of occupation was caused by his heart disease and by the advice of his physician; that during the months of May and June in the year 1936 said deceased was suffering from a severe and serious attack of heart trouble, to wit acute congestive heart failure and rheumatic carditis and that subsequent thereto and prior to the date of said application for insurance, the said deceased had been told by his physician that he had heart trouble; that said deceased had been under observation and treatment for a serious disease and affliction, to wit heart disease, in the Thomas D. Dee Memorial Hospital at Ogden, Utah, from the 4th day of June, 1936, to the 14th day of June, 1936; that the deceased had made claim for and was paid compensation under the provisions of the Workmen's Compensation Act of Utah for injuries sustained by him in an accident which occurred on or about the 26th day of May, 1936, at Ogden Canyon, Utah, while deceased was employed as a laborer by Barnard and Curtis Company; that said deceased had lost considerable time from his work as a result of said accident or as a result of his heart trouble during the months of May and June, 1936, and was thereafter disabled and prevented by reason of said condition from engaging in his former usual occupation; that said deceased had suffered a severe impairment of the body during the months of May and June, 1936, and had consulted with and had been treated by a physician, to wit Dr. J. G. Olson of Ogden, Utah, during said months and for a long time thereafter; that from the 2nd day of June, 1936, to the date of said application said deceased had been under the care of and had been treated by said Dr. J. G. Olson for the heart disease; and during said period had been examined by said doctor and by other physicians.

"9. That at the time of making said statements, representations and answers in said application for insurance as aforesaid, the said deceased well knew that the same were false and untrue and that plaintiff would refuse to issue or deliver to him the policy of insurance if informed of the facts with reference to the matters and things to which said statements, representations and answers referred. That plaintiff believed and relied upon and was deceived by said statements, representations and answers made by said deceased in his said application as aforesaid and isued and delivered said policy in reliance thereon.

"10. That said chronic rheumatic heart disease from which said deceased was suffering at and prior to the signing and making of said application for insurance was of grave and serious nature and in a substantial degree impaired his physical condition and seriously affected and increased the risk incident to insurance upon his life. Plaintiff alleges upon information and belief that between the date of said application and the date of decedent's death the said decedent continued to suffer from said chronic rheumatic heart disease and that said disease directly and proximately contributed to his death. That plaintiff would have refused to issue or deliver said policy of insurance had it been informed or known that said deceased had had an acute congestive heart failure in May and June, 1936, or had it been informed or known that said deceased had been treated by a physician during 1936 and that said physician had diagnosed his condition as chronic rhemuatic heart disease, or had it known that said deceased had suffered from any disease of the heart, or had it not believed and relied upon said statements, representations and answers and each thereof.

"11. That during the month of July, 1941, in the course of its investigation relative to the cause of the death of deceased, plaintiff for the first time learned that the statements, answers and representations made by said deceased as set forth in paragraph 3 hereof were false in the particulars set forth in paragraph 8 hereof. That immediately upon being informed that said statements and representations were false and untrue plaintiff, on August 1, 1941, tendered to the defendant its check in the sum of $58.37, said sum being the amount of all premiums paid upon said policy, and interest thereon from the respective dates of payment, and notified the defendant that it had elected to and did rescind said policy of insurance because of the false representations made by said deceased in his said application as aforesaid. That defendant has retained said check in her possession."

There are other allegations relating the plaintiff's being ready and willing to do whatever it ought to do in rescind-

ing the policy and to the incontestable clause of the policy, followed by a prayer that plaintiff be relieved of liability and the policy be cancelled and annulled.

A demurrer was overruled and defendant answered, denying the allegations contained in the complaint above quoted, and others, and filed a counterclaim in which are alleged the issuance of the policy, the defendant named as beneficiary, the death of the insured, the filing of proof of death and demand for payment, the refusal of plaintiff to pay, and alleging "that decedent did not make any false or fraudulent representations concerning his health  *  *  * as an inducement for the issuance of said policy; and that said policy was and is a valid legal obligation on the part of plaintiff to pay to the defendant the said sum of One Thousand Dollars," and praying for judgment for the face value of the policy.

Plaintiff replied to the counterclaim, denying that defendant is the person to whom the face amount of the policy should be paid upon the death of decedent (although affirmatively alleging in its complaint that defendant is so named), and denying that insured did not make false and fraudulent representations.

The case was tried to a jury, which returned a verdict in favor of defendant and answered special written interrogatories to the effect that insured did not make fraudulent answers in his application for insurance, and added that, "We feel that Eldon Grow knew the answers written on the policy [application form] but that the Agent had failed to make the question clear to him."

Our statute, Sec. 43-3-24, Subsec. (4), R. S. U. 1933, provides:

"It shall be unlawful for any life insurance company to issue or deliver in this state any life insurance policy unless the same shall contain the following:  *  *  *

"(4) A provision that the policy shall constitute the entire contract between the parties, and that all statements made by the insured shall, in the absence of fraud, be deemed representations and not

warranties, and that no such statement or statements shall be used in defense of a claim under the policy, unless contained in a written application therefor and a copy of such application shall be endorsed upon or attached to the policy when issued."

The contract of insurance in question contains such a provision. Thus, the question as to whether or not insured made false and fraudulent representations by his answers in the application for insurance for the purpose of deceiving, defrauding and inducing plaintiff to issue the policy is controlled by the principles laid down in the first case of *Chadwick* v. *Beneficial Life Ins. Co.*, 54 Utah 443, 181 P. 448, 452, from which we quote:

"* * * Our statute above quoted says that 'all statements made by the insured shall in the absence of fraud be deemed representations and not warranties,' and we see no reason to hold that the statute does not mean exactly what it says.

"In that view of the case we are of the opinion that in order to void a policy on the grounds of false statements of the insured it is incumbent upon the insurer *to both allege and prove actual fraud on the part of the insured* as contemplated in defendant's theory of defense in the instant case. Besides this, in our opinion, the cases supporting this view, examples of which we have furnished, are more in accord with reason and justice than those holding the opposite view." (Italics ours.)

As its first witness, plaintiff and appellant called Dr. J. G. Olson, the physician of the insured and his family. In order to better illustrate the case, the doctor's testimony is here abstracted quite in detail. This privileged testimony was shown to have been waived by the insured in his application for the insurance and by the defendant beneficiary in writing to the doctor. Sec. 104-49-3, Subsec. (4), R. S. U. 1933. The doctor testified that he had known the insured from about 1933 or 1934 to the time of his death (July 3, 1941); that he first treated him June 2, 1936, at his home in Huntsville; that he was called to his home because he was ill, with pain and distress; that as to the history of the case, Grow stated he had been working for a construc-

tion company, laying pipe in Ogden Canyon, and about the middle of the afternoon of May 28, 1936, while working in a deep trench a cave-in occurred and he and some fellow employees were trapped in the trench; when earth commenced to slip, some workmen shouted warning and he braced himself with his shovel against one wall and struggled very violently to keep from being buried in debris, and succeeded in working his way up out of the trench so he wasn't buried but exerted himself very violently and immediately after he was short of breath with pain and distress in his chest; he continued to work for about an hour but had so much pain in his chest and pounding of his heart he felt ill; went home and continued to have pain in his chest that night but went to work next day and worked half a day (May 29, 1936), ate his lunch at noon, made him ill and he vomited, so he went home and took to bed that evening and had been more or less continually confined to bed from the 29th to the night the doctor saw him, June 2nd; chief complaint was difficulty in breathing, pain in his chest and discomfort and a pounding of the heart, and the doctor's diagnosis at the time was that he "had participated in violent exercise which brought in acute heart failure, acute dilation of the heart, due to the violent exercise he went through when this accident occurred"; that "he had signs and symptoms of heart failure, and that he had a chronic scarring of the valves of the heart. What doctors call rheumatic heart disease, and that people call valvular heart disease." The doctor continued to treat him after that, the treatment period was in phases; he was removed to the hospital because he was "in acute congestive heart failure"; he was discharged from hospital after some days and went to his folks' home in Ogden and finally returned to his home in Huntsville; the immediate treatment period covered from June 2 to September 9, 1936; there was somewhat of a break and subsequent treatment following that; the doctor knew it was an Industrial case and sent a report to the Industrial Commission and the State Insurance Fund; and

in the final report to the Commission and in his treatment, he diagnosed insured's "heart condition as being such that he would not be able to continue the type of work that he was doing" and that was the diagnosis made during the period of time stated and later when his condition was being reported to the Industrial Commission and the State Insurance Fund.

"Q. Your diagnosis of that was that because of the heart condition you found from your examination of Mr. Grow, that Mr. Grow was not able to do laboring work which he had previously done? A. I will try to answer that in two parts. I reported to the State Insurance Fund, as my opinion, he was not able at the time of discharge to return to the same occupation and probably would never be able to do hard work as he had previously done, *but to the patient I advised he should not return to that kind of work.*" During the time I was treating Grow, I advised him of the condition I found as to his heart. Subsequent to that treatment and prior to his death, I was called upon to treat Grow again. "Q. State when that was and the occasion? A. Let me explain this to the Court and Jury. I think both of the attorneys are acquainted with it. I became the family Doctor and was the family Doctor, and Mrs. Grow was under my care; and the kids. Mr. and Mrs. Grow I felt were very close friends of mine, apart from being patients. You get to have that feeling for them. I saw Eldon oftentimes when he would come to the office with his wife, and frequently talked to him about his work and his activities and so on; and he was, of course, very impetuous and I used to discourage his doing as much as he wanted to do and felt able to do. He carried on very active work in the interval before his final illness. I don't remember the exact date, but in the spring of 1941 he came, in April sometime, to the office with Mrs. Grow, who was under my care at that time * * * and casually I talked to him. He didn't come in on his own account. He came with her, and casually I talked with him and from talking with him I got the impression he was perhaps overdoing himself a little bit. His work entailed the climbing of a lot of stairs and that sort of thing; and he had had some pounding of the heart and a little shortness of breath. Some symptoms of that kind. However, he was not under active treatment, but I would sort of casually advise him, and from that time to the time of his acute final illness I was hearing from him occasionally by telephone and saw him in the office with Mrs. Grow, but he worked until the onset of his acute final illness two or three days before he died."

He was sent to the hospital again before he died. I was out of town the night he was admitted but saw him a few hours or such a matter shortly thereafter. Acute congestive heart failure was one of the causes of his death. He was in the hospital approximately two days before he died. These are the only times I treated him.

On cross-examination, the doctor further testified: I have known Eldon Grow sometime prior to June 2, 1936. A casual acquaintance through his sister who is a friend of Mrs. Olson and mine. He was a young man. [Age 27 at death.] I knew him before he was married in 1935, for a couple of years. I knew he was a farmer boy living in Huntsville. On this job in 1936 he told me he had obtained this temporary employment, assisting in the construction of the Ogden City Water Works System.

"A. Yes; I knew his regular occupation was that of light farming and dairying. He was doing temporary work down there, because it was sort of a slack season, in between season."

I was called to his home in Huntsville on June 2, 1936, and found him in bed. I got from him the history of the case, how while working in a trench in Ogden Canyon there had been a cave-in; and he over-exerted himself in protecting himself from being covered with debris. I concluded that it was the excitement and exertion that rather stimulated the heart condition. In other words, a strong, vigorous young man suddenly confronted with a situation of that kind from a combination of circumstances, and the exertion to try to keep from being covered would stimulate and overtax his heart. He was in the hospital from June 5, 1936 and discharged June 14, 1936, counting in and out ten days, he was under my care." The treatment given him: "He was first of all given a total, what the doctors or nurses speak of as 'total cardiac bed rest' and nursing care; which means the patient be in a proper position for comfort, and be given every nursing care to protect against over-exertion, and given direct medical treatments, digitalis and what not for

relief." That is the usual treatment for a heart condition of this type. He very promptly responded to the treatment and was discharged from the hospital after a period of ten days, and taken to the home of his father, Arthur Grow. I can tell you exactly how frequently I saw him immediately after he was discharged from the hospital—house calls on June 15, 16, 17 and 18 to ascertain his condition. Then again on June 22, 23 and 24. Calling to ascertain his condition and administering treatment go hand in hand—it is difficult to separate them. If a person is under continuing treatment one makes a call to determine how they are getting along. He was under medical treatment—receiving medicine that time. I have the exact record, June 26 and 28 and again on July 2nd. I think exactly five house calls were made in July, at about weekly intervals. I saw him at his home three times during August, and once at the office. In the meantime he had moved back to Huntsville. Don't know whether or not he was doing some work during summer of 1936. He responded nicely to my treatment. September 9th is the date of final discharge. One visit on September 9, 1936. I considered myself as family physician. Mrs. Grow had a young baby. I was called to take care of that and to look after the child. Occasionally, Eldon would bring his wife to the office and having an interest in him, I would talk to him. He didn't come as a patient. That was the condition that prevailed from September, 1936—and would be just three years later that the policy of insurance was issued. I would see him at irregular intervals during period from September, 1936 to August, 1939. He did pretty vigorous active work during certain portions of this time. I know the kind of work he was doing. "Well, he was doing some gardening, and all the tasks that went with that, and he was taking care of some milk cows, and he was doing janitorial work in the school and when I saw him handling the milk cows I used to scold him about it, but that is what he was doing." I only know in a general way the kind of janitorial work he was doing at the Huntsville School; I found

out that he was loading and unloading coal and climbing stairs three and four stories high, and wheeling the coal into the building, mowing lawns and doing work of that kind. Notwithstanding that fact, I did not treat him for any attack at all. And then after the issuance of this policy in August, 1939, three years after the accident, I didn't treat the deceased until 1941, a period of nearly two years after the policy was issued; during the Spring of 1941, Mrs. Grow was under my care and I had occasion to see Eldon; Mrs. Grow was pregnant; he regularly brought her to the office and I must confess the treatment so far as he was concerned was rather casual—he wasn't under direct treatment, I would say, until two or three days before he entered the hospital and Mrs. Grow or his daddy or mother saw me and talked about his condition; he had a heart attack at night, was awakened short of breath with a cough and so on but hadn't any treatment at the time. He died July 3, 1941. It was only a short time before that that I began giving active treatments. He was taken to the hospital and died very suddenly. I don't have a copy of the death certificate but think diagnosis showing cause of death was acute left heart failure—failure to function was localized in the left side. "Perhaps the Court would want to know that doctors distinguish between the lesser circulation of the right side of the heart through the lungs and the greater circulation of the left ventrical. One may have either heart failure of the right side, failure to pump blood through the lungs, or failure of the left side to pump through the body. The two sides do not function independently. It is connected up, but you can have distinctly right or left heart failure." I would not say it wasn't acute—he didn't have symptoms of coronary occlusion, in my opinion. That means a clot in one of the blood vessels that nourishes the heart itself through the coronary arteries that nourish the heart, that carries nourishment to the heart. One of the arteries is blocked by a clot. We call that coronary occlusion; coronary thrombosis is the blocking of the blood vessels that nourish the

heart muscle, under such circumstances if the heart vessel is not large enough the person may die suddenly. An occlusion is one of the most frequent cause of heart death; but that is not the cause here—is my opinion. Myocarditis means the inflammation of the heart muscles, the covering of the myocardium is called the epicardium. Grow had a very sudden attack and only survived a few days.

"Q. Well, just what was it that caused the blood not to function there, if there was not an occlusion? A. Oh, well, he had previously had at sometime in the past * * * an inflammation of the lining of the heart; chiefly * * * that the valves of the heart were scarred. Now when the valves are scarred the blood does not circulate in a normal manner, and one of the chief injuries to the heart was scarring, and injury to the valves that control the flow of blood out of the left side of the heart. So when the heart pumped the valves were insufficient for the load and some remained back into the lower left chamber. This causes an extra load on that chamber of the heart and this may finally fail because of the increased work it has to do.

"The Court: Q. By 'failure' you mean to stop? Yes, that is right, to die. * * * Because of the load as in milking cows, after two or three times your arms give out. No matter how willing you are to go ahead you push the muscle beyond the capacity to respond. * * * Many people have a scarred heart and are entirely ignorant of it, or even know they have such a thing; especially true of a rheumatic heart.

"Q. They may have a rheumatic heart contracted while a child and may never know anything about it and not realize it? This was objected to as immaterial—that the Doctor stated he so advised Grow of his heart condition.

"The Court: Others may have advised him to the contrary. It goes to the question of good faith. In other words, whether or not Grow under the conditions or sickness * * * in good faith could have thought he didn't have heart trouble even though the doctor told him so."

The doctor continued by testifying that he concluded the scarring had been there some time; was an existing condition at the time of the accident; the accident brought it to life. "I advised Eldon distinctly he was not to do heavy physical exertion. Q. Did you tell him he had a scarring condition? A. Yes sir; words to that effect." Told him not to do heavy work. "My policy surely is not to frighten my patients."

"Q. You always seek, do you not, to keep them in the proper mental condition? A. I don't like to go beyond the limits to answer the question, but I would like to explain that to the court and jury, but this is my opinion. Organic heart disease is a serious business. I think fear, where there is organic heart disease it is bad to develop apprehension in the patient. When one has organic heart disease one must talk frankly up to a point, but one tries to protect the patient without creating fear. It is exceedingly difficult not to do. That is my opinion. We have someone with cardiopathy, that is a person who has organic heart disease and is likely to be a person with a nervous apprehension, unduly fearful, and my natural experience is I find it difficult to strike a balance between how much to tell the patient as to the facts of the matter and how much to withhold. I try to protect my patients and not let them do something which I think is harmful to them. If a person has organic heart disease I try to teach him, as best I can, but on the other hand, I know from my own experience with the patients I have had I have done a great deal of harm if I create fear in the patient about his condition. Now, however wise and experienced a man may think himself to be he may fail in either one of the particulars. I find in my practice I do fail at times to teach the patients correctly and in the matter of expressing excessive fear by the amount of instruction. This is the most difficult part in the diagnosis or treatment to instruct the patient in getting him to cooperate with what I think he should do, without causing fear, I do not want to offend anyone, but I think fear is and I thought the Court and Jury should understand this, because, otherwise, I think that the evidence would indicate I am a poor doctor, or he a bad patient. I think I was a good doctor to him, and I think he was a good patient."

Evidence was then introduced showing that insured had been paid a total of $282.80 as compensation by the State Insurance Fund for temporary total and partial disability over the period from June 1 to December 31, 1936.

Plaintiff then produced its soliciting agent, Ezra B. Jones, who had been employed by the Company for about three years and who took the application for insurance from Grow. He testified on direct examination that he had known the insured prior to obtaining the application from him. That in August, 1939, he met Grow in a store, talked with him about insurance and went to his home in Huntsville where he talked further with him and his wife. He stated the application was what is known as a non-medical applica-

tion, that "in certain districts where we are quite a distance from the office of the doctors they allow us to write a non-medic application providing the person is within the required age limits, and he appears to be in a healthy condition." The application is in two parts. Part II contains the answers in question in this case. He testified: "The questions in Part II of the application were read to Mr. Grow. I read each and every one to Mr. Grow and he answered them just as they are there—the answers found on the application are the answers made by Mr. Grow. I wrote the answers down. After the questions were propounded and the answers written down, Mr. Grow signed the application" which was then sent to the Company, the policy was issued and he, agent Jones, delivered it to the insured at his home in person.

We quote parts and generally abstract his testimony on cross-examination in some detail, for obvious reasons: I had known Eldon for probably ten years prior to August, 1939, but did not become acquainted with him until probably a year and a half before I sold him this insurance. I met him at a party in Huntsville, a shower—my daughter married a relative of Eldon's—she married into the family of which Eldon is a member. It was in mid-winter, in 1937, prior to the time I went to work for the New York Life. I went to work for them in 1938. The party was held in Mrs. Jenson's home, an aunt of Eldon's. Eldon was a robust looking boy, very much so. Very healthy looking. I talked to him some time at the house. I visited and talked with him. There was more or less a mutual interest created because my daughter was marrying in the family. I have lived in Ogden all my life. My residence here has made me pretty well acquainted in Huntsville, and naturally solicited insurance when I went into business. Was permitted in Huntsville by the Company to write insurance on non-medical applications; that was the case when I was some little distance from Ogden. There was no New York Life doctor closer than Ogden, a distance of about twelve miles. Prior to August 28, 1939,

I had been in Huntsville quite often in the furtherance of my business. Because of previous acquaintance with Eldon I naturally became interested in selling him insurance. Some other company, sometime or months previous, had solicited him. I suggested I would like the business and solicited him. I only talked to him one time in the store at Huntsville— there were other prospects there and I was discussing insurance with the group; it was the very day he signed; he looked robust and was working hard, didn't see anything that indicated any disability—I asked him about that— asked what he was doing, then talked to him some about how he might take this policy, how he might arrange to pay for it; and we two went over to the house, Mrs. Grow was there. I had met her at the same place. We came into the living room where Mrs. Grow was, and then it was I obtained the application. I was there about an hour or an hour and a half; we went over the application—nothing else was transacted other than obtaining the application; I had application blanks with me. Everything on the application except the signature, "Eldon Arthur Grow," is in my handwriting. We were in the front, or living room, and Mrs. Grow was there. "Had been talking it over in the store. I was discussing and several of us were talking there. I wanted to contact Eldon sometime, so I made a point to go over and talk to him at a table in Wangsgaard's store. He told me Mr. Monson solicited him sometime before that, but wasn't financially able to buy at the time. I suggested, inasmuch as it was fall time, he was getting his returns, I could give him some time on his first payment. I suggested we go over to the house and discuss it with Mrs. Grow." That is what prompted me to go to the house, and he wanted Mrs. Grow to know about it. I discussed generally the kind of insurance, the nature and amount they could take; explained the different kinds of insurance and gave them my experience and judgment as to which I thought best—and recommended an Endowment Policy at 65. Then explained whether or not the risk was to start at time of application or on delivery of policy and that there were various elections

that might be made. It was determined they would take the policy dating from delivery. Then question of dividends and options came up, was discussed, and they decided to let the dividends accumulate. We had quite a discussion before we got down actually to filling out the application. I took the papers out of my pocket—cannot remember whether we sat at a table or what—difficult to remember—but I talked to Mr. and Mrs. Grow.

"Well, we filled out the first part, first taking it just in order. There is an application, non-medical application, one of two sheets of it.

"Q. Part I and II? A. Yes, we start and first get the name, birth and the dates and those things, then after that we get this medical information.

"Q. So that you fill out the first part of the application paper and then get down to this, the taking of the questions. A. The health questions, you mean?

"Q. Yes. A. Yes.

"Q. You naturally were anxious to write this business? A. Yes, surely."

As an insurance man, he further testified that he was anxious to do that; it meant financial compensation. It was his business to handle, solicit and encourage the writing of insurance.

"Q. You then first filled out the first page, and did you read everything to him on that front page? A. No, not on the first page. I asked him the questions and filled them out. There isn't anything much to read on the first page.

"Q. You say there isn't? A. Not pertaining that type policy he bought of us.

"Q. Did you read that to him so he could familiarize him [self] with it? A. No, I didn't.

"Q. So, you are quite certain you didn't read all that? A. Let me read that and see. (Witness reading.)

"Q. Yes. A. I discussed this part that he raised on it. That is the only reading matter that is, with the exception of when the insurance goes into effect.

"Q. You discussed that quite thoroughly with him? A. Yes sir.

"Q. I see. Thank you for going over that so you can explain to the jury. *How long do you think you were filling out the second part?* A.

*Oh, I think ten minutes or fifteen minutes, that would be all."* (Italics ours.) My recollection, my guess, yes. I think Mrs. Grow was still there, sure. I don't think she went out all the time.

*"Q. And do you recall whether Mr. Grow read this application at all? A. I don't think he did.*

*"Q. He didn't read it at all? A. I don't think so."* (Italics ours.)

I was interrogating and also the scrivener, answering the questions. Yes, as we went down the application we read those questions, out loud, so everyone could hear—like we are talking here. "Yes, that is the only way I can fill it, is to read it over as I fill it." I don't go through and simply put no, no, no, after the answers, without anything having occurred. I merely get the answers as to the circumstances and details.

"Q. So you don't necessarily mean when you say that is all, the only way you do it, you don't necessarily mean that you could take the answers without reading them too? A. We are instructed to take it also.

"Q. That is your instruction from the home office? A. Yes.

"Q. You then started out on the said application to the New York Life Insurance Company, Part II, that section, 1. Then you read it? A. Yes.

"Q. 'Have you within the past five years been continuously and are you now in good health?' A. Yes, sure.

"Q. You recall reading that out at the home to him? A. Yes sir.

"Q. And he answered, 'Yes'? A. That is right.

"Q. Now, at that time you knew he had had this accident, didn't you? A. Not at that time, no.

"Q. Did you know he had an accident two or three years before? A. I had never known that he had had an accident.

"Q. And then you left for the next question and read that out loud, audibly, in a way so it could be clearly understood, 'To what extent within the past five years have you used wine, spirits or malt liquors?' A. That is right.

"Q. You went over that? A. I went over it hurriedly, because I knew there was no question on this, but I went over it hurriedly.

"Q. You went over it hurriedly and then you asked, 'Have you used any of them to intoxication or excess during that period?' A. Yes.

"Q. You are quite sure of that? A. Yes.

"Q. Naturally you knew in advance what that answer was? A. That is right.

"Q. Then you moved over to the third question,—I just wonder how long it took you to do this, you asked his height, exact, that is that question? A. That is right.

"Q. How did you determine the answer to that, 5' 8"? A. He gave it to me.

"Q. Without measuring him? A. That is right.

"Q. I think it says, 'exact'? A. Yes.

"Q. What is your height, exact? A. 5' 6½". I know my exact height. But I didn't measure his—just took his word.

"Q. You took a little time to discuss that question? A. Well, I wrote.

"Q. The next question you asked was what his present weight was? A. That is right.

"Q. And he told you 150 pounds. A. Yes, if that is what it is there.

"Q. And the next question, 'Have you gained or lost weight during the last year?' Do you recall that? A. Yes.

"Q. And he answered 'No.' He said he had neither lost nor had he gained any weight? A. Yes, I remember that, that is right.

"Q. It would have to require a little discussion, wouldn't it, as to what he weighed. A. It would if he had additional in weight, but as long as he weighed the same as that it is checked, it would if some abnormal condition of a person's health.

"Q. Then you started to go down the rest of the questions in detail, reading them out loud to him in the presence of his wife, these questions? A. That is right.

"Q. And his making the answers? A. That is right.

"Q. Did he answer them audibly? A. Yes.

"Q. So there wasn't any whispering between them at all? A. No, you see, because at that time we came down to the questions and I took his word for it. I didn't dispute his word on anything he says.

"Q. But then you think you read the questions in full to him in such a way he understands it? A. Yes, and when he gives me his answer to all those questions.

"Q. I appreciate that. So in all there were fourteen questions, and some of them were subdivided into three or four parts, that is correct? A. Yes.

"Q. And then when you had it completed with the answers you passed it to him and he signed it. A. Yes.

"Q. And Question 8(a), do you recall how you asked that question? Let me read it to you: 'Have you now, or have you ever had, or ever been told that you had, tuberculosis of lungs or any other part of body, spitting of blood, high blood pressure, heart trouble, kidney trouble, diabetes, disease of brain or nervous system, paralysis, epi-

lepsy, syphilis, cancer or tumor, stomach or intestinal ulcer?' You read it about like that? A. Just about like that.

"Q. In other words it calls for an answer to twenty different kinds of illness? A. Yes.

"Q. You kind of hurried over it? A. We just read it through like you did there, then put either yes or no.

"Q. Either 'Yes' or 'No.' And, you think you were there an hour and a half? A. I would say about an hour or an hour and a half.

"Q. At any rate the whole business transaction took place, and it was all done at that one sitting? A. That is as I recall it, yes sir.

"Q. Now, you saw Eldon frequently after this policy was written in 1939, didn't you? A. Yes, I saw him five or six times, I guess.

"Q. And he appeared to be in good health? A. Not a bit. Not a thing.

. "Q. That is, you mean by that there was nothing to indicate he was not in good health? A. No; he always appeared healthy to me.

"*Q. And you did not know of any illness until he died? A. No sir.* (Italics added.)

"Q. Now, did you hear anything about this accident? A. Well, after we got all through,—*I don't know whether the time I sold him or delivered the policy,* something was said about this accident in Ogden Canyon, and, as I recall it brought to my mind in Court this morning, something was said it was a slide or something and that he over exerted himself, and as I understand, I asked if there was any vital injuries at that time, or any after effects, and there were none, and, as I remember it, ask him to see more as a precautionary measure of other people he had worked for, but there was nothing said about any after effects from that at all.

"*Q. In other words you had learned he had been in an accident and had gone to bed? A. That is right.*

"Q. And that he had consulted a physician? A. Well, we didn't even go into that, about the doctor or not, because he wasn't injured, and there was no permanent injury of any kind from the accident.

"*Q. And, knowing that you didn't make a notation of that on the policy? A. No, sir. But I delivered the policy to him.*

"*Q. And it didn't occur to you you should notify the company of those facts? A. No, because I didn't know. I don't think that was discussed at the time we sold it.*

"Q. You said it either then or when you delivered the policy to him? A. Yes.

"Q. But you do recall it was one time or the other? A. Yes, that is right.

"Q. That is what I am trying to get at. Isn't it the practice, what I am asking about, isn't it pretty much your practice, in your desire

to write insurance to more or less pass some of those things up to make it look good? A. No, because this application? (Witness interrupted by objection, which was overruled.)

"Q. Try to think back now, Mr. Jones, Don't you think, in all probability, Mr. Grow told you that he had this accident and had taken a rest cure, and you just didn't consider it of sufficient importance to write it down, so you thought it wasn't very serious? A. That is what I said before, when it was mentioned, it was mentioned but there was no bodily injury, and nothing of a permanent injury.

"Q. You wrote it in? A. Yes, that is right.

"Q. Instead of saying in the application that he sustained a slight injury and took a rest cure, you wrote it just 'no?' A. He didn't receive an injury did he?

"Q. You say he told you that he had been in something? *A. Overexertion is what he explained to me.* The way he explained it to me.

"Q. So, instead of saying to one of the question he told me he did have at one time over exertion and took the rest cure, you figured it wouldn't make any difference, and you said 'No?' *A. Yes, it had been several years before the time I sold the policy, certainly I didn't think it had any bearing on this.*

"Q. So these answers are in your handwriting from your conclusion of the information which you gleaned from him? A. That is right.

"*Q. And he didn't read it afterwards at all? A. Read the questions?*

"Q. He didn't read it? (Objection made and overruled.) *A. I don't know whether he read it or not; he signed them.* * * *

"Q. Now, Mr. Jones, do you think, after you got that, do you think you read this statement: 'On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them.' *Do you think you read that? A. No, I didn't read that.*

"Q. Or, 'I expressly waive, on behalf of myself and of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician or other person who has heretofore attended or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information which he thereby acquired.' *You didn't read that, did you? A. No.*

"Q. You didn't read that? A. That last part I never read, but the person he may have read it himself. That I don't know.

"Q. But you wouldn't say he did? A. No, I wouldn't say that for sure." (Italics ours.)

On redirect examination, agent Jones further testified:

"I gave him this application to sign. I don't know whether he read it or not before he signed it. I didn't tell him not to read it. I handed it to him in a way he could read it if he wanted to.

"Q. Now the question you say as to his discussing about some accident, is it your best recollection that occurred after this application was filled out and signed? A. It is, yes sir. That took place after this application was signed? A. Yes.

"Q. Do you now have a recollection that [it] took place when you delivered the policy? *A. No, I am quite sure it was the time I sold it, but after the time I had written up the application.*

"Q. And neither Mr. Grow or yourself suggested you go back and change the application? *A. No sir, didn't consider important enough.*

"Q. Neither one of you went back and changed this at all? A. No sir.

"Q. He didn't that time tell you that he had any heart trouble, did he? A. No sir.

"Q. When you read the question here in the application whether he was suffering from a heart ailment, his answer was 'No' and you wrote it down as 'No,' is that right? A. That is right." (Italics ours.)

Further, on recross-examination:

"Q. Well, at any rate, you obtained Mr. Grow's information and wrote it there, that is the answers as made were not true in one or two respects. A. No.

"Q. Well, that he had had some over-exertion and had gone to bed? (Discussion.) A. Yes, if he has been in an accident the only time we record it is if there has been a bodily injury. That is my understanding of it.

"Q. So you answer, 'No,' if no bodily injury? A. No apparent effects. It happened a long time before. He seems to be alright.

"Q. Yes, you wrote 'No' irrespective of the fact he says I did have an injury. I got into something and had a bodily injury, instead of saying that, you say, No? A. Yes."

The defendant, Mrs. Grow, was then called and testified that she is the beneficiary named in the policy, that she had known her husband about two years before they were married in November, 1935; he was a milk hauler for the Weber Central when they were married; he later dug post holes in Beaver; they lived at his father's home in Huntsville, and

her husband ran the place, doing the chores, milking the cows morning and night, and running the farm, and accepted other various kinds of day labor, as opportunities presented; that he appeared healthy before August, 1936; was a hard worker; that he was working for the construction company in August, 1936, when the cave-in occurred in the trench in which he was laying pipe; that Dr. Olson attended him and he was in the hospital for ten days; that they went to California on a trip for three months in early 1937; after their return, they rented a house in Huntsville and insured worked as janitor in the church meeting house and amusement hall and continued to milk cows for his father; later went to work for the school board, kept the furnace going, cleaned the class rooms, hauled coal in wheelbarrow and shoveled it in stoker; he did not complain at all and appeared fine to the last; he never consulted a doctor, except that when she went to the doctor's, he would go with her and the doctor would talk to him, tell him to take it easy.

She then related the circumstance of the soliciting agent, Mr. Jones, coming to the home August 28, 1939, when the insurance application was signed; that she talked with Mr. Jones and her husband about the insurance, was present all the time and heard them talking. Direct examination:

"Q. I will ask you, Mrs. Grow, do you recall any time **Mr. Jones** reading the questions to your husband and asking for the answer? A. I cannot remember.

"Q. You cannot remember anything of the kind? A. I cannot remember a thing. I heard him talking about it, I knew he was writing in there, but I don't remember his reading any.

"Q. Do you remember his reading: 'Have you within the past five years been continuously and are you now in good health?'? A. I cannot remember.

"Q. Or reading the questions: 'Have you now, or have you ever had, or ever been told that you had, tuberculosis of lungs or any other part of body, spitting of blood, high blood pressure, heart trouble, kidney trouble, diabetes, disease of brain or nervous system, paralysis, epilepsy, syphilis, cancer or tumor, stomach or intestinal ulcer?'? Do

you remember any such questions being asked? A. I cannot remember of one of the questions.

"Q. Do you recall of any questions of that kind or character being asked of your husband? A. No."

She further testified that from the date the policy was delivered, about September 9, 1939, insured's health was fine, he never complained at all, except when going upstairs too much in the school house; was working every day, taking care of the town school and other things besides his church work, and milking cows morning and night; was finally taken ill and died suddenly July 3, 1941.

On cross-examination, she testified:

"Q. I think you stated your husband occasionally complained of his heart when he was going upstairs? A. When he got the school house job.

"Q. That is when he would be going up and down the stairs. A. Yes.

"Q. He would complain of some heart trouble? A. Complain of being short of breath."

The father of insured, Arthur W. Grow, testified, corroborating the circumstances of the accident in August, 1936, and the nature of the work done by insured before and after it occurred. He testified: As to Eldon's appearance prior to the date of this alleged injury, I never knew there was anything wrong with him before that, he seemed robust. Never knew of his having heart trouble or anything of that kind, I never knew there was anything wrong with him. His general condition from August, 1939, on up until the Spring of 1941 was good. On cross-examination:

"I did not know the Doctor had advised my son, following the accident, that his heart was affected. I never had any conversation with the Doctor that I know of.

"Q. Did your son ever tell you about it? A. Well, I knew he was going to see the Doctor, he and his wife, at the time.

"Q. Didn't he tell you that the Doctor had advised him as to this heart condition? A. I don't remember he even mentioned it.

"Q. You mean to say you don't know this accident disclosed this rheumatic heart condition? A. Well, I had no idea of it. * * *

"Q. Don't you think you heard what was causing that total perma-nent disability? A. Well, I presume.

"Q. Well did you or not. If you did why tell us. Did you know he was suffering a heart condition that time that kept him off work? A. Well, I knew there was something wrong.

"Q. Didn't you know it was his heart? A. I wouldn't know whether his heart or not. I had no idea.

"Q. Didn't you make inquiry as to what kept your son off work from June to September? A. I knew he was going to see Doctor Olson at the time.

"Q. And you made no inquiries as to what was causing him to be off employment during that period of time? A. Well, yes; I had kind of an idea that he was ill.

"Q. What was your idea? A. He was ill.

"Q. Did you know what was causing the illness? A. No, I didn't.

"Q. At no time? A. No, I didn't.

At the conclusion of the foregoing testimony, plaintiff moved for a directed verdict. The motion was denied. The court instructed the jury generally and submitted the following special interrogatories, which were answered by the jury as indicated:

"The Court herewith requests that you answer the following special interrogatories:

"(a) Did the Agent of the New York Life Insurance Company pro-pound the questions on the printed form of the application for the insurance policy to Eldon A. Grow? (Answer Yes or No) Answer: No.

"(b) Did Eldon A. Grow answer falsely any question propounded to him by the agent of the New York Life Insurance Company on the application for the insurance? (Answer Yes or No) Answer: No.

"(c) Did Eldon A. Grow have knowledge of what answers were recorded on the copy of the application endorsed on and attached to the insurance policy? (Answer Yes or No) Answer: Yes.

"(d) Did the agent of the New York Life Insurance Company cor-rectly record the answers to the questions on the application for the insurance policy? (Answer Yes or No) Answer: No.

"(e) Did Eldon A. Grow fraudulently make any false and untrue answer or answers to any printed question or questions on the appli-sation for the insurance policy with intent to deceive the New York Life Insurance Company? (Answer Yes or No) Answer: No.

"(f) If your answer to interrogatory (e) is 'yes' then state the number of the question answered falsely by Eldon A. Grow. The

questions and answers on the application are attached hereto and numbered from 1 to 7 inclusive? Answer: ————.

"(g) If your answer to interrogatory (e) is 'yes,' then state whether the false answer or answers to a fact or facts concerned the condition of the insured's health or physical condition that actually contributed to his death. (Answer yes or no) Answer: ————.

"We the jury answer the special interrogatories as set forth above.

"(Sgd) Clarence Johnston, Foreman.

"We feel that Eldon Grow knew the answers written on the policy but that the Agent had failed to make the question clear to him.

"(Sgd) Clarence Johnston, Foreman."

The jury returned a verdict against plaintiff and in favor of defendant on her counterclaim. Findings, conclusions and judgment accordingly were made and entered. Appellant assigns as error the findings of the court in Nos. 3, 6, 7, 8, 9 and 10. These findings are here set out in full:

"3. That one Ezra Jones, a solicitor for the Plaintiff, interviewed the said Eldon A. Grow concerning certain information called for in said application and that the said Ezra Jones wrote the purported answers which appear in said application and then presented said application to the said Deceased for his signature. That the Deceased thereupon signed his name to said written application but did not read said application either before or at the time of signing or subsequently thereto. That a copy of said written application as prepared by the said Ezra Jones with the signature of said Deceased appearing thereon is attached to the policy which was thereafter issued by the Plaintiff and is by reference incorporated in and made a part of these findings without setting them out in full herein."

"6. The Court further finds that certain of the answers made by the said Ezra Jones in said application and thereafter signed by the said Deceased were untrue in this: That at the time of the signing of said application and for several years prior thereto, the Deceased was affected with heart disease, to wit, Chronic Rheumatic Heart Disease. The said heart disease was brought into activity by reason of an accident sustained by said Deceased on the 26th day of May, 1936, while said Deceased was working as a common laborer for a construction company in digging a trench for the purpose of constructing and placing therein a water pipeline from Ogden Valley to Ogden City. That said Deceased sustained no broken bones or no external injuries but by reason of over exertion in attempting to prevent sliding earth burying him and by reason of the fear and other contributing causes the Deceased brought on the heart attack above referred

to and thereafter he consulted one Dr. Olsen who diagnosed his case as heart disease and ordered him to be taken to the Thomas D. Dee Hospital at Ogden, Utah, where said Deceased was confined from June 5th to June 14th, 1936. That after said Deceased was removed from said hospital he continued to suffer total disability for several months and partial disability until December 31, 1936. That Dr. Olsen treated said Deceased for said heart ailment from June 2, 1936, until September 9, 1936. That said Deceased made claim for and was paid compensation under the provisions of the Workman's Compensation Act of Utah for the period from May 26, 1936, to December 31, 1936. A portion of said time the Deceased drew total disability and the remainder of said time the Deceased drew partial disability. That commencing some time during the Fall of 1936, said Deceased returned to the farm of his father upon which he was living and started to perform some work incident to the operation of said farm. That during the years 1937, 1938, and up to the time of the signing of said application, said Deceased performed heavy manual labor. That while he occasionally visited Dr. Olsen, he came only for the purpose of bringing his wife or children or both to the Doctor for treatment and did not visit the Doctor for self-treatment or advice, but that on some of those occasions Dr. Olsen asked the Deceased how he was and cautioned him against overdoing himself. That at the time of the signing of said application, for several years prior thereto, and up to a short time before his death, said Deceased appeared to be robust and healthy and that during all of said time he worked hard at manual labor. That at the time the Deceased visited said Dr. Olsen, he was advised by said Doctor that he had suffered a heart attack and that he would have to be careful in the future.

"7. The Court further finds that at the time the said Ezra Jones was filling out said application and before the same was forwarded to the Plaintiff, that said Deceased told the said Ezra Jones of the accident which he had sustained in May of 1936, but the said Ezra Jones, upon learning that there had been no external injuries sustained as a result of said accident, concluded that it was not necessary to say anything about same and answered 'No' to the interrogatory.

"8. The court further finds that while the answers to questions No. 1, 3, 4, 5, 6, and 7, as written by the said Ezra Jones in said application were untrue yet the Court further finds that statements, representations, and answers, as made by the Deceased to the said Ezra Jones were not falsely made and that the said Deceased in making said application for insurance did not falsely or fraudulently or with intent to deceive or defraud the Plaintiff make answers to said questions. That while there was a breach of warranty in the answers as

set forth in said application, the Court finds that there were no wilful or intentional misrepresentations of fact made therein.

"9. The Court further finds that the Plaintiff offered no evidence that it believed and relied upon and was deceived by said statements or answers made in said application or that it issued and delivered said policy in reliance thereon. Nor did the Plaintiff offer any evidence that it would have refused said policy of insurance had it been informed or known that said Deceased had an acute congestive heart failure in May and June of 1936, or had it been informed or known that said Deceased had been treated by a physician during 1936, and that said physician had diagnosed his condition as chronic rheumatic heart disease and for that reason the Court finds that the Plaintiff did not sustain either of the foregoing allegations by any evidence whatsoever.

"10. The Court finds that the Deceased died on the 3rd day of July, 1941, from a heart attack suffered a short time before his death."

The principles of law applying to this case are laid down in *Chadwick* v. *Beneficial Life Ins. Co.*, supra, and reaffirmed in *Chadwick* v. *Beneficial Life Ins. Co.*, 56 Utah 480, 191 P. 240. These rules were again applied and reaffirmed by the United States Circuit Court of Appeals, 10th Cir., in the two cases of *Zolintakis* v. *Equitable Life Assur. Soc. of U. S.*, 1938, 97 F. 2d 583, and 1940, 108 F. 2d 902. In the first Zolintakis case, 10 Cir., 97 F. 2d 583, at page 586, it is held:

"In the law of insurance a misrepresentation by the insured is an oral or written statement of a material fact or condition affecting the risk made by the insured to the insurer which precedes and is not a part of the contract, unless it is expressly stipulated that it shall be, and is either *intentionally untrue* or *made with a reckless disregard for its truth or falsity. Sentinel Life Ins. Co.* v. *Blackmer*, supra. [10 Cir., 77 F. 2d 347, 350]." (Italics ours.)

In the second Zolintakis case, 10 Cir., 108 F. 2d 902, at page 905, the court holds:

"By this decision [the Chadwick cases] Utah is committed to the liberal doctrine that before misrepresentations of material facts will void a policy of insurance it must be established that they were not only *knowingly made but also wilfully and intentionally, with intent to deceive and defraud.*" (Italics ours.)

In the light of these principles and in view of all the testimony in this case, which, for that purpose, we have set out quite at length, and in view of the verdict of the jury and its answers to the special interrogatories submitted, we cannot but hold that there is sufficient evidence to support the findings of the court complained of.

Defendant contends that there is a failure of proof of the allegations set out in paragraphs 10 and 11 of plaintiff's complaint, which stand denied by defendant. These paragraphs are hereinabove quoted and when considered carefully with the testimony in the case, the record discloses that defendant's contention is well made. There is no proof of these essential allegations, and the trial court so found in its Finding No. 9. But had there been, we cannot say that the verdict of the jury would have been different or that there would not remain sufficient evidence to support the verdict, findings and conclusions.

It was the burden of plaintiff to establish actual fraud on the part of insured, that he made the material misrepresentations shown by the application knowingly and with intent to deceive and defraud the plaintiff insurance company. This it failed to do.

Considerable discussion is devoted to the form of this action, whether it is a law or equity case, and plaintiff at the trial took strong exception to the impanelling of the jury which had been demanded by defendant, plaintiff contending that the action was commenced as an equity action to cancel the policy on the ground of false and fraudulent representations. We have carefully considered these questions and find no error in impanelling the jury for the purpose of determining the question of actual fraud or the lack of it. *Petty et ux.* v. *Clark et al.,* 102 Utah 186, 129 P. 2d 568.

Plaintiff complains of the court's denial of its motion for a new trial. On the record we find no error in the trial court's order. There are other errors assigned, but they

need no special consideration in view of our affirmance of the judgment.

The judgment of the lower court is affirmed, with costs to respondent.

CLARENCE E. BAKER, District Judge, concurs.

WOLFE, Chief Justice (concurring in the results).

I concur in the results. The case of *Chadwick* v. *Beneficial Life Ins. Co.*, 54 Utah 443, 181 P. 448, holds that the insurer must allege and prove "actual fraud" on part of the insured. Certainly evidence that the representations made by the insured were untrue and that he knew or should have known that they were untrue, would ordinarily be sufficient proof of the fact that they were fraudulent—that is that insured intended to deceive the insurer. But since actual fraud must be alleged and proved, evidence to rebut the conclusion which would ordinarily follow from proof of the above facts may be given. We have gone a long way in Utah in this regard. The testimony of Jones was that he read the questions to the deceased, and that the latter understood them and that it was concluded between them that the condition of deceased was not serious. Therefore it cannot be said that the answers given to questions (a), (b), (c), (d), (e), (f), (g), and (h) under the circumstances of the this case would not support a finding that deceased had not intended to deceive. That conclusion was for the fact finder under the evidence.

I do not think finding No. 9 was in proper form. The finding is not as to whether evidence was or was not offered as to a certain fact, but what the fact is. In this case the court was called on to find (1) whether plaintiff believed the answers of the insured; (2) whether it relied on them; (3) whether it was deceived by them; and (4) whether it would have refused to issue the policy if it had known the truth. No direct evidence is necessary to establish such facts. They are inferable from all the circumstances. Why

would the insurer ask the questions if it did not believe the answers? What purpose would there be in asking them? And certainly where the questions are as to very material matters, matters on which the very decision of the company to accept or reject an application for a policy depends, it is obvious that it relied on them. What reason for asking the question except for the purpose of relying on the answers. If it relied on them it must have been deceived by them since it appears that it did not know the truth until after insured's death. And it is certainly inferable that such material questions were asked which if the truth had been known would have meant a rejection of the policy, that the company would have done what proper administration would demand that it do. To accept a policy from a man who suffered from pronounced organic heart disease necessitating a change of occupation within five years would be a gross infraction of duty to the other policyholders. It may be asked what purpose it would have served to put an officer, having the final decision to accept or reject a policy, on the stand to get him to give an answer, the truth of which could in the last analysis be checked only by the inferences deducible from the other testimony. Hence why not accept such inference in the first place. It would certainly be startling and totally unexpected if an officer of a company which brought a suit founded on the very basis that it had been deceived and had acted on the deception, would testify to the contrary. It would seem useless to put him on the stand to testify to facts which everyone has already inferred from the circumstances of the case and the very purpose of the questions and answers. Therefore I do not think the so-called findings in paragraph 9 of the Findings of fact would support a denial of judgment for the plaintiff.

I do not think the principles of *Petty* v. *Clark*, 102 Utah 186, 129 P. 2d 568, apply in this case on the question of whether defendant was entitled to a jury. This is not a case which comes under Sec. 104-23-5, Utah Code Annotated 1943. The counterclaim is upon the contract of insurance but the fundamental question was: **Was**

there a contract on which defendant could sue, or should it be set aside for fraud? The only questions which the jury was required to decide were in relation to the matter of fraud. If the contract was not voidable there was no question of defendant's right to recover. The company did not dispute the fact that policy had been written nor its amount nor contend that payment had not been made. Its sole attack on the policy was that it was fraudulently obtained and should be set aside. The issue here was purely equitable. *In re Helin's Estate*, 55 Utah 572, 188 P. 633. I do not understand the case of *Petty* v. *Clark*, supra, to hold that every question of fact is triable by a jury. Where the only inquiry is as to facts which will enable the court to determine whether it will exercise or withhold its equitable powers, such questions of fact are equitable. Otherwise, a jury may be demanded in every case where there is a question of fact. Such was never the intent of the Clark case. Furthermore, it appears from a reading of Sec. 104-23-5, Utah Code Annotated 1943, that there are law actions in which a jury is not demandable, a matter which I think we have at times lost sight of.

In this case a jury was not demandable but that does not mean that if one was granted it is error which entitles the objecting party to a reversal. The court in this case treated the verdict of the jury as advisory. The answers of the jury to some of the special interrogatories were contrary to the evidence and contrary to the findings of the court. The court evidently found from the evidence independently of the jury. While no jury was demandable the court, permitting one, treated its verdict as advisory. Therefore, I think there is no reversible error in that regard.

LARSON, Justice (concurring).

I concur. But I deem it advisable to make a comment on the error assigned as to the submission of a cause to the jury. In the first place, the answers of the jury to the

special interrogatories are inconsistent with each other, probably due to the fact that the interrogatories were not clear. In the second place, the findings of the court are not consistent with the answers of the jury. If it be conceded that appellant were correct in its argument that this case should have been tried by the court without a jury, it would not be entitled to a reversal because the court treated the jury as advisory only, and made its own findings of fact at variance with those of the jury. So the findings and judgment entered are those of the court and do not rest upon the findings of the jury.

McDONOUGH, Justice (concurring).

I concur in the order affirming the judgment. The testimony of Jones, agent of the defendant, to the effect that the insured at the time of making application for the policy had revealed the happening of the accident which gave rise to the impairment of his health, was such, in connection with other facts and circumstances shown by the evidence, as to permit the trier of the fact to conclude that there was not an intentional concealment of material facts.

This testimony, together with that of the same witness, from which the reasonable inference could be drawn that the insured did not read that portion of the application which in effect called attention to the materiality of the answers to the questions propounded and the reliance to be placed thereon by the insurer, is such that we may not say that the contrary inference is compelled by clear and convincing evidence. In thus concluding, however, I desire to say that the rule that a misrepresentation, in order to defeat recovery on an insurance policy must be made "with intent to deceive and defraud the insurance company," as stated in the principal opinion, does not in my opinion permit the trier of the fact to find an absence of such intent where an applicant knowingly misrepresents facts which he knows would influence the insurer in accepting or rejecting the risk.

I concur in what is said by Chief Justice WOLFE in his concurring opinion relative to finding of fact No. 9 of the trial court, and as to the issue raised relative to submission of the case to the jury.

PRATT, J., on leave of absence.