Finkle, Appellant, *v.* The Western & Southern Life Insurance Co., Appellee.

(No. 8683—Decided February 8, 1960.)

*Mr. Thomas A. Luken* and *Mr. Bernard Fox*, for appellant.
*Messrs. Kyte, Conlan, Heekin & Wulsin*, for appellee.

O'CONNELL, J. Plaintiff, appellant herein, was the wife of Paul W. Finkle, deceased. The deceased, who was in the upholstery business, wanted to borrow money for business purposes. In some manner, he contacted Paul Daly, district sales manager for The Western & Southern Life Insurance Company, appellee herein, with reference to obtaining such loan. An application was made to The Western & Southern Life Insurance Company for a loan, but this application was rejected. However, Mr. Paul Daly did assist Mr. Finkle in securing a loan at the Hyde Park Building & Loan Company. In consideration for these services Mr. Daly reminded Mr. Finkle that the latter had promised Mr. Daly that Mr. Finkle would apply to The Western & Southern Life Insurance Company for insurance if Mr. Daly had succeeded in obtaining a loan for Mr. Finkle. Mr. Finkle, thereupon, on April 24, 1959, made an application to The Western & Southern Life Insurance Company for life insurance in the sum of $10,000. At the time of the application there were present Paul W. Finkle, Paul Daly, Mr. Finkle's son-in-law, Alphonse Nachbauer, and Mr. Finkle's daughter, Barbara Nachbauer.

The medical examination was made by Dr. Frank Clement, examiner for The Western & Southern Life Insurance Company, whose report was that Mr. Finkle was a good risk. The insurance policy, No. 200 92 49, dated May 3, 1957, was then issued.

Meanwhile, on April 17, 1957, Alphonse Nachbauer had been appointed an agent of the appellee; and, later, on the day of the said application, April 24, 1957, his license was issued by the Superintendent of Insurance, at Columbus, Ohio.

Previously, in January 1956, the appellant herein, wife of Paul W. Finkle, noticed that her husband had lumps on his neck. She thereupon urged him to see a doctor. After much resistance, in January 1956, Paul W. Finkle went to Dr. Hesselbrock who suggested that Finkle have some tests made at the hospital. Again, after much coaxing, Mr. Finkle submitted to

these tests. Then Dr. Hesselbrock called the appellant herein to tell her that Mr. Finkle was suffering from a form of cancer. Later on, the patient took treatments for a couple of months at the hospital under Dr. Charles Barrett, after which the swellings disappeared. Meanwhile, Mr. Finkle continued to work until the date of his death, June 28, 1958. At no time did anyone inform Mr. Finkle of the precarious state of his health.

The insurance company denied payment on the claim filed by appellant on the basis that the insured was suffering from an incurable disease at the time he made the application for the insurance. The beneficiary then filed suit on the insurance contract, in which suit she maintained that "if the insured had such a condition, such fact was known by the defendant at such time." After each party had rested, the appellee renewed a motion (previously made) to arrest the evidence from the jury and to enter judgment for the appellee. The court found that the motion was "well taken," and it was therefore granted for the reason that the insured was not in good health "at the time he procured the insurance policy in question." The court found further as follows: "Twelve reasonable minds could come to no other conclusion than that the deceased insured in this case was not in sound health at the time he procured the insurance policy in question; that he was suffering from a cancerous condition of the lymph glands and that the insured received treatment therefor at a hospital and had hospital radium treatments within a period of five years preceding his application. The application shows he had no treatment from a physician within five years; that he failed to disclose these treatments or attendance to a physician at the time of his examination; that his condition of health was withheld from the defendant company by the beneficiary of the policy, his wife, the plaintiff in this case; and that the beneficiary knew of his cancerous condition to the point where she debated whether she would call the company and tell them that he had a cancerous condition.

"That one Nachbauer, son-in-law of the deceased, was not acting within the scope of an agent of the defendant company at the time the policy was issued, and that the agent of the company, one Daly, nor the company did not have knowledge of the cancerous condition of the deceased or insured in this case

at the time the application was issued and the premium paid.''

From this finding, the appellant has filed an appeal in this court on the following grounds:

"The court erred in arresting the evidence from the jury, and in granting judgment for the defendant-appellee, and in finding that as a matter of law that

"A. The agent of the company, one Paul Daly, did not have any knowledge of the cancerous condition of the insured at the time the application was issued and the first premium paid.

"B. That one, Alphonse Nachbauer, was not acting within the scope as an agent of the defendant-appellee at the time the policy was issued.

"C. The insured's state of health at the time of the procurement of insurance was a bar to recovery, and that the defendant-appellee was not estopped from relying on the condition of sound health to void the policy.

"D. The knowledge of the widow, beneficiary, of decedent's health was a bar to recovery.

"E. Jury should not decide whether or not the insured was asked the history questions on the medical examination, and whether the answers, whether true or false, should bar recovery under this policy.''

Now in the case of motions, like the one filed in this case, the question of law presented is ''whether each fact indispensable to the right of action or defense and put in issue by the pleadings has been supported by sufficient evidence to raise questions of fact for the jury—that is, whether there is evidence which tends to prove each and all facts necessary to be proved in order to maintain the action or defense.'' 39 Ohio Jurisprudence, 792, Section 179.

So it is said in the first three paragraphs of the syllabus of *Ellis* v. *Ohio Life Ins. & Trust Co.*, 4 Ohio St., 628, 64 Am. Dec., 610:

"The courts of this state, in a proper case, have the power to take the evidence given by the plaintiff from the jury, and order a peremptory nonsuit.

"Such a motion involves an admission of all the facts which the evidence in any degree *tends* to prove, and presents only a

question of law, whether each fact, indispensable to the right of action, and put in issue by the pleadings, has been supported by some evidence.

"If it has, the motion must be denied; as no finding of facts by the court, or weighing of the evidence, is permitted."

And in the first paragraph of the syllabus in *Dick* v. *Railroad Co.*, 38 Ohio St., 389, it is likewise said that:

"A motion to arrest the testimony from the jury, and render a judgment against the party on whom the burden of proof rests, involves an admission of all the facts which the evidence tends to prove, and presents only a question of law for the court; but if there is evidence tending to prove each material fact put in issue, and indispensable to a recovery, it should be submitted to the jury under proper instructions."

Also, consider paragraphs one and two of the syllabus in *Schnable* v. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.*, 102 Ohio St., 97, 130 N. E., 510, as follows:

"1. A motion by defendant in a negligence case, at the close of all the evidence, to arrest the case from the jury and for judgment in defendant's favor, presents a question of law only and the motion involves an admission of all the facts which the evidence tends to prove.

"2. If there is any evidence tending to prove each material fact indispensable to a recovery, the motion to arrest must be overruled, and the evidence should be submitted to the jury under proper instructions, unless the undisputed evidence shows that the plaintiff has been guilty of contributory negligence."

Likewise, the same rule of law is laid down in the first paragraph of the syllabus of *Lazarides* v. *Turowske*, 28 Ohio App., 208, 162 N. E., 610, as follows:

"Motion for directed verdict involves an admission of all the facts which evidence in any degree tends to prove and presents only a question of law as to whether each fact indispensable to the right of action and put in issue by the pleadings has been supported by some evidence, and, if it has, the motion must be denied, since no finding of facts by the court or weighing of the evidence is permitted."

And in paragraph one of the syllabus in the case of *Snell* v. *Consolidated Street Ry. Co.*, 9 C. C., 348, 6 C. D., 346, the same principle appears as follows:

"It is clearly the law of Ohio, as settled by repeated adjudications of the Supreme Court, 'where the question of contributory negligence depends upon a variety of circumstances from which different minds may arrive at different conclusions as to whether there was negligence or not, the question ought to be submitted to the jury under appropriate instructions.' And 'if the testimony be conflicting, the facts uncertain, *or the proper inference to be drawn therefrom doubtful* in such case it would be error for the court to withdraw the case from the jury, or direct them to return a particular verdict.' "

There is a reiteration in paragraph three of the syllabus of *Zugaj, Admr.*, v. *Chief Redpath*, 45 Ohio App., 159, 186 N. E., 815, as follows:

"Verdict should not be directed, if there is room, under all facts and circumstances, for sensible men to differ in conclusions."

Though the "scintilla rule" was abolished in *Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St., 469, 189 N. E., 246, the rule requiring the court to permit the jury to determine the facts as long as reasonable men might arrive at different conclusions is still substantially the same. The holding in that case simply requires a greater amount of evidence. Let us look in this regard at the third and fourth paragraphs of the syllabus in that case, which read as follows:

"3. Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor. But if upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict against him.

"4. Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence."

And as 39 Ohio Jurisprudence, 792, Section 179, puts it: "In either case if, by admitting, for the purposes of the motion, all the facts which the evidence, given a reasonable construction in favor of the plaintiff, tends to support or prove, it appears

that each fact indispensable to the right of action and put in issue by the pleadings has been supported by evidence with respect to which ordinary, candid and intelligent men may arrive at different conclusions, or, if undisputed, is such that reasonable minds might draw different inferences or reach different conclusions—if, in other words, under all the facts and circumstances in evidence, there is room for sensible men to differ in their conclusions—the motion must be denied and the case submitted to the jury under proper instructions from the court."

In this last regard, see: *Employers' Liability Assurance Corp.* v. *Roehm*, 99 Ohio St., 343, 124 N. E., 223, 7 A. L. R., 182; *Hickman* v. *Ohio State Life Ins. Co.*, 92 Ohio St., 87, 110 N. E., 542; *State Automobile Mutual Ins. Assn.* v. *Lind*, 122 Ohio St., 500, 172 N. E., 361; *Farmer* v. *Richmond et al.*, *Commrs.*, 5 Ohio Law Abs., 662; *Burton Preston Co.* v. *National Granite Co.*, 5 Ohio App., 117, 25 C. C. (N. S.), 470, where the syllabus reads as follows: "Where facts necessary to a determination of the issues involved are in dispute it is error to direct a verdict, and such a situation is presented where there is conflict in the evidence as to material facts and some of the questions of fact are of such character that different minds might arrive at different conclusions."

See, also, *American Fidelity & Casualty Co.* v. *Bennett*, 69 Ohio Law Abs., 386, 125 N. E. (2d), 754, decided December 31, 1952, Court of Appeals of the Seventh Appellate District. The first paragraph of the headnotes in the *Bennett case* is: "Where the allegations of a petition stated a 'cause of action and there was sufficient credible evidence to support all of the necessary allegations that, when established, would entitle plaintiff to judgment, the court did not err in overruling defendant's motion for judgment on the pleadings or his motion for a directed verdict"; *Cole & Motors Ins. Corp.* v. *Huntington*, 64 Ohio Law Abs., 605, 110 N. E. (2d), 625; *Leary* v. *Macheski*, 92 Ohio App., 452, 110 N. E. (2d), 800, where the second paragraph of the syllabus is as follows: "Where all the facts and circumstances in a cause, as disclosed by the evidence, are of a nature which would cause reasonable minds to differ as to the ultimate conclusion to be drawn therefrom, it is prejudicial error to direct a verdict in favor of defendant and deny plaintiff the right to have the cause submitted to the jury for consideration."

The rule is the same even in "de novo" cases in the Court of Appeals. So it is said in the sixth paragraph of the Syllabus of *Laskey* v. *Hilty*, 91 Ohio App., 136, 107 N. E. (2d), 899: "Upon a trial *de novo* in the Court of Appeals, a motion of defendant for a 'directed verdict,' made at the conclusion of plaintiff's case, will be treated as a motion for judgment and raises the question whether defendant is entitled to judgment as a matter of law. In passing upon such motion, the plaintiff is entitled to have the evidence construed most strongly in his favor, and if upon every essential issue the evidence is such that reasonable minds may reach different conclusions, the motion should be overruled."

And, from 53 American Jurisprudence, 261, Section 320, there is this: "If there is any evidence which would justify an inference of disputed facts upon which the plaintiff's right to recover depends, the court should refuse to enter a nonsuit no matter how strong the proofs may be to the contrary." And from the same volume, at page 262, Section 324, there is this statement: "It has been said that a nonsuit should only be granted when the evidence wholly fails to support the demand of the plaintiff, and that it cannot be granted if there is any evidence to support the action, since the question of the sufficiency of the evidence is for the jury. But the doctrine that a scintilla of evidence is sufficient to carry the question to the jury is said to be that of some older cases only." Also from the same volume, at page 263, Section 325, it is stated: "Nor should a nonsuit be granted where the facts are in dispute because of contradictory evidence, or the inference from the evidence is open to debate. A motion for a nonsuit should be granted only where there is no contrariety of evidence as to the facts, and not where the evidence raises a question for the jury."

And so, in *Sidney Sch. Furniture Co.* v. *Warsaw Sch. District*, 122 Pa., 494, 15 A., 881, 9 Am. St. Rep., 124, the third paragraph of the syllabus is as follows: "There is in every case triable by a jury a preliminary question of law for the court, whether or not there is any evidence from which the fact sought to be proved may fairly be inferred; if there is, it is sufficient to send the case to the jury, no matter how strong may be the proofs to the contrary."

Similar holdings prevailed in *Godefroy* v. *Hupp*, 93 Wash., 371, 160 P., 1056, Ann. Cas. 1918E, 494; *Hemmens* v. *Nelson*, 138 N. Y., 517, 34 N. E., 342, 20 L. R. A., 440.

The same general principles are enunciated in 88 Corpus Juris Secundum, 556 *et seq.*, Section 244, thus: "In determining this [whether the plaintiff's evidence is sufficient] the court cannot discard the proof in plaintiff's favor and consider only that favorable to the defendant, or permit defendant's proof to overthrow plaintiff's even though it is more reasonable and convincing, *but rather it is controlled by evidence favorable to plaintiff.* The court considers only the evidence tending to prove plaintiff's case, that is, it considers only plaintiff's evidence and as much of defendant's as is favorable to plaintiff or supports his case.

"Ordinarily evidence favorable to defendant is eliminated from consideration, since a nonsuit is not granted on defendant's evidence; and thus facts proved as matters of defense cannot be considered on the hearing of the motion. * * *

"* * * Plaintiff must be given the benefit of every piece of evidence which tends to sustain his averments. * * *

"* * *

"On a motion for dismissal or nonsuit the court cannot weigh the evidence. *Evidence contradictory to that supporting plaintiff's contention must be disregarded and all doubts arising therefrom are resolved in plaintiff's favor. * * *"* (Emphasis supplied.)

See, in this regard, *Johnson* v. *Seaboard Air Line Ry. Co.,* 163 N. C., 431, 79 S. E., 690, Ann. Cas. 1915B, 598.

This same rule with reference to the court being controlled by evidence favorable to the plaintiff is to be found in 39 Ohio Jurisprudence, 802, Section 183, and in 53 American Jurisprudence, 257, Section 313. In the former work it is stated thusly: "The trial judge, in ruling upon a motion, to direct a verdict or for a nonsuit on the evidence introduced, must not only assume the truth of evidence in behalf of the party against whom the motion is directed, but must construe the evidence most strongly in favor of that party, or, as it is sometimes expressed, must give the most favorable interpretation or intendment in his behalf, and adopt the view most favorable to his contention,

or consider it in the light most favorable to him, of which such evidence is susceptible."

So, in the second paragraph of the syllabus in *Wilkeson, Admr.,* v. *Erskine & Son, Inc.,* 145 Ohio St., 218, 61 N. E. (2d), 201, it is said that: "Where a defendant, at the close of all the evidence, moves the court to direct a verdict in its favor, the plaintiff is entitled to have the evidence construed most strongly in his favor. (*Hamden Lodge* v. *Ohio Fuel Gas Co.,* 127 Ohio St., 469, approved and followed.)"

And in 53 American Jurisprudence, 257, Section 313, it is said that "in passing on the defendant's motion for a nonsuit, the evidence on behalf of the plaintiff must be accepted as true, and all conflicts of testimony must be resolved in his favor; *the evidence must be interpreted most favorably to him and most strongly against the defendant.* Indeed, the defendant's evidence may not be considered except in so far as it tends to clarify or explain the evidence of the plaintiff." (Emphasis supplied.)

1. In *Sullivan* v. *Mountain States Power Co.,* 139 Ore., 282, 9 P. (2d), 1038, the first paragraph of the syllabus states: "Motion for nonsuit and directed verdict is controlled by evidence favoring plaintiff."

2. *Mitchell Camera Corp.* v. *Fox Film Corp.,* 8 Cal. (2d), 192, 64 P. (2d), 946, where the first paragraph of the syllabus is as follows: "On a motion for a nonsuit, if the plaintiff has presented evidence of so substantial a character that notwithstanding any conflict which would be raised by evidence produced by the defendant to the contrary it will support a judgment in his favor, the motion must be denied, *and the evidence must be taken most strongly against the defendant.*" (Emphasis supplied.)

3. *Connors* v. *Southern Pacific Co.,* 91 Cal. App. (2d), 872, 206 P. (2d), 31, where the second paragraph of the syllabus is: "On a motion for nonsuit, the trial court may not weigh the evidence nor the credibility of witnesses, but the plaintiff is entitled to full credit for all evidence in his favor together with the reasonable inferences which may be drawn therefrom."

4. *Seaford* v. *Smith et al., Admrs.,* 86 Cal. App. (2d), 339, 194 P. (2d), 792, where the second paragraph of the syllabus is:

"On a motion for nonsuit at the close of plaintiff's case, the court may not weigh the evidence nor discredit the witnesses, and if the evidence of a witness is conflicting, his statements most favorable to plaintiff must be accepted as true."

5. *Kerr* v. *Bullock's, Inc.*, 75 Cal. App. (2d), 277, 170 P. (2d), 966.

6. *Amendt* v. *Pacific Electric Ry. Co.*, 46 Cal. App. (2d), 248, 115 P. (2d), 588.

7. *Darling* v. *Dreamland Bedding & Upholstering Co.*, 44 Cal. App. (2d), 253, 112 P. (2d), 338, where the fourth paragraph of the syllabus is: "On a motion for nonsuit, the evidence must be taken most strongly against defendant *and every favorable inference and presumption fairly arising from the evidence must be considered as facts proved for plaintiff, and where evidence is susceptible of two constructions or inferences the court must take the view most favorable to plaintiff, disregarding contradictory evidence.*" (Emphasis supplied.)

8. *Green* v. *Newmark*, 136 Cal. App., 32, 28 P. (2d), 395.

9. *Groth* v. *Singerman*, 328 Mich., 615, where the second paragraph of the syllabus is: "On motion to dismiss at conclusion of plaintiffs' evidence, the testimony introduced in their behalf must be considered in the light most favorable to their contentions."

10. *Dooley* v. *Pennsylvania Rd. Co.*, 23 Northumberland Legal Journal (Pa.), 228.

11. *Cozart* v. *Hudson*, 239 N. C., 279, 78 S. E. (2d), 881.

12. *Register, Admr.*, v. *Gibbs*, 233 N. C., 456, 64 S. E. (2d), 280.

13. *Wall, Admr.*, v. *Bain*, 222 N. C., 375, 23 S. E. (2d), 330.

14. *Green* v. *Floe*, 28 Wash. (2d), 620, 183 P. (2d), 771, where the first paragraph of the syllabus is:

"In the determination of a motion for nonsuit, a directed verdict, and a judgment n. o. v., even though the plaintiff's evidence is in some respects unfavorable to him, he is not bound by the unfavorable portion of such evidence, but is entitled to have his case submitted to the jury on the basis of the evidence which is most favorable to his contention."

15. *Moen* v. *Chestnut*, 9 Wash. (2d), 93, 113 P. (2d), 1030.

16. *Dye* v. *City of Seattle*, 173 Wash., 515, 24 P. (2d), 67.

17. *Pfingst* v. *Mayer*, 93 Cal. App. (2d), 265, 208 P. (2d), 1002.

18. *Kerby* v. *Elk Grove Union High School District*, 1 Cal. App. (2d), 246, 36 P. (2d), 431.

19. *Millage* v. *Spahn*, 115 Colo., 444, 175 P. (2d), 982. Also, *Taylor* v. *Borough of Modena*, 4 Chester County (Pa.) Reports, 463.

The law in the matter seems to be, therefore, that if there is any evidence tending to prove facts, necessary for a recovery, no matter how strong the proof may be to the contrary, or even though the evidence is contradictory and left open for debate, and, that if the evidence is such that reasonable men may arrive at different conclusions concerning the facts which it establishes; the court must deny the motion for arrest of judgment or for an instructed verdict, and must furthermore be controlled by evidence favorable to the plaintiff and unfavorable to the defendant, and must refrain from weighing the evidence or the credibility of witnesses, and disregard evidence which contradicts plaintiff's evidence, and must furthermore resolve all doubts in favor of the plaintiff, and construe the evidence and all its inferences most strongly in favor of the plaintiff and most strongly against the defendant, and furthermore must accept as true those contradictory statements of a witness which favor the plaintiff, and for purposes of passing on the motion must regard as true the plaintiff's evidence and the inferences to be derived therefrom.

Therefore, keeping in mind the law as thus stated and remembering that for the purposes of the motion the plaintiff's evidence must be accepted as true, it becomes our task to analyze the plaintiff's evidence in this court to determine whether or not the trial court was justified in granting the motion to arrest judgment. And in this regard our attention has been focused on the testimony of Paul Douglas Finkle, son of the deceased, as that testimony is set forth on pages 174, 178 and 179 of the record. In this testimony, Mr. Finkle sets forth a colloquy that took place between Mr. Paul Daly, agent of The Western & Southern Life Insurance Company, and Dr. Frank Clement, who had examined the deceased insured for physical fitness, as a result of the latter's having made an application for

insurance. Mr. Finkle was telling of his visit along with that of his brother-in-law, Alphonse Nachbauer, to the home of Mr. Daly on June 28, 1959. Previously, on the same date, he had been called to his parents' home, after his mother had informed him of the death of his father. Dr. John Hesselbrock had examined his father's body, a priest had been called and he had gone after his said brother-in-law. Later on, he had gone home. Meanwhile the said brother-in-law had gone to Dr. Hesselbrock's office to have the death certificate signed. Then he and Mr. Nachbauer had proceeded to Mr. Daly's home. On arriving there, Mr. Nachbauer had informed Mr. Daly of the insured's death. Then they had repaired to Mr. Daly's kitchen where Mr. Daly had interrogated Mr. Finkle about X-ray treatments that the deceased had taken. Later Mr. Daly had said that he was going to call Dr. Clement. He therefore called Dr. Clement.

Now, in attempting to understand the meaning of the language that is about to be described, we must keep in mind certain matters about words and their significance. First, we should remember that words are arbitrary signals or signs or symbols that we have invented to communicate ideas; that there are other methods of communication, such as gestures; that sometimes words are used in their ordinary or literal sense; that other times, they are used in an unusual or extraordinary sense; that when they are used in the latter sense, they are referred to as figures of speech (which are simply unusual expressions); that they are so called for the reason that a figure is a likeness or an image, and many of these figures of speech are founded on the idea of similarity between the objects involved; that these figures of speech are called tropes (which, from the Greek meaning, "turned around," are simply words used not in their normal sense, but rather used in an extraordinary or "turned around" sense); that these tropes run through our written and spoken language and even into our slang; that the peculiar meaning of a word often depends on the situation or circumstance; that the meaning of a word is often determined by our tone of voice or by the accompaniment of a certain gesture; that the meaning of a word may depend upon one's humor or frame of mind; that although all words denote, and to

some extent connote, there are those whose connotation is very marked, and of course by connotation (con equals *cum* meaning *with*) is meant that characteristic of a word by which it not only stands for an idea, but by which it suggests another idea or other ideas.

Keeping these cautions before us, we shall proceed to the conversation between Mr. Daly and Dr. Clement to try to determine its meaning under the circumstances. We must caution ourselves again that, under the law as we have enunciated it, the account of the conversation that follows must be accepted by the trial court as having taken place.

Now the conversation, according to Paul Douglas Finkle, between Mr. Daly and Dr. Clement began by Mr. Daly's asking Dr. Clement whether he remembered Paul Finkle. Then there was a pause. We may assume from the later conversation that Dr. Clement was having difficulty in remembering Mr. Finkle. Then Mr. Daly, apparently to refresh Dr. Clement's memory, said: "You know the fellow I sent about a year ago for a life insurance examination." Apparently, Dr. Clement was still having trouble remembering Mr. Finkle and his examination. Then there was another pause indicating that Mr. Daly had not succeeded in recalling the visit of Mr. Finkle to Dr. Clement for a medical examination. And then, to apply more pressure upon the doctor's memory, Mr. Daly said: "You know, you called me afterwards and said 'since when are you insuring that kind of men.' " There still seemed to be no recollection on Dr. Clement's part, for there was another pause, indicating that Dr. Clement either said nothing at all or that he indicated that he did not remember Mr. Finkle. Then Mr. Daly, still trying desperately to recall the case for the doctor, said: "You know 'since when are you insuring dead men?' "

Now, of course, we do not know what Dr. Clement said, if he said anything at all. But we do know from Mr. Daly's words, what Mr. Daly said that the doctor had said to Mr. Daly after Mr. Finkle had been examined. Now we must attribute a meaning to these two sentences that the circumstances of the case call for. We must remember at the time that the insured was suffering from cancer and that during the course of the cancer ailment the insured had suffered from heart disease. However,

if a person be suffering from cancer and heart disease, it is but reasonable to assume that his general health is affected and to such extent that a medical examination may reveal that this general condition of health was not good.

In any event, when Dr. Clement said to Mr. Daly "since when are you insuring that kind of men" the word "kind" obviously referred to a group that is ordinarily noninsurable. Under the circumstances that have been referred to, it could not possibly have referred to any other group; such as, white men or large men, or wealthy men or distinguished men; it must have had reference to a group whose health was involved.

This statement which seems logical to us is in direct conflict with No. 2 on page 2 of the addendum to the brief of the appellee. No. 2 reads as follows: "There is no inference of unsound health from this sentence: 'Since when are you insuring that kind of man?' 'That kind of man' can mean anything. It can mean dirty men, black men, drunken men, sick men, etc. There is nothing from which an inference can be drawn that it means the man is in unsound health."

Now if a person is sent to you, an examining doctor, for a medical examination and later on you are called on the telephone about the application and you say, "since when are you insuring that kind of men," there would be no occasion for you to have reference to any kind of men except well men or ailing men. Hence it would be highly improbable under the circumstances for a normal person to be talking about dirty men, black men, drunken men for an insurance examination.

The other question that (according to Mr. Daly) the doctor asked, "Since when are you insuring dead men?" simply confirms what we have said above. Of course in this case the word *dead* is a metaphor. It is not to be taken in its literal sense. Everyone knows that a dead man cannot apply for insurance, much less be examined for it. What the doctor was saying was: "Why are you sending me some one who is so ill that he is similar to a dead man?" Or, perhaps the doctor was making use of a figure of speech known as a hyperbole, which is simply an exaggerated statement founded on similarity. In other words, the doctor was saying "Why are you sending me a very sick man?" Incidentally, it could have been said in jest as the said

addendum states in No. 3, page 2, but in earnest or in jest it could have no other meaning than the one that has been described.

Assuming, as we must, the truth of the testimony of Paul Douglas Finkle, we must conclude that Mr. Daly was put on notice by the doctor that the insured Paul Finkle was not a good risk.

Furthermore, Paul Douglas Finkle, the son of insured deceased, testified as follows:

"Q. Did he [Daly] say anything to you after he'd hung up? A. He said that—After he hung up he told me that Dr. Clement had called him after my father had been in for the examination and told him that my father was a sick man and he said that 'I told him to put the policy through anyway.' "

Now first let us attempt to determine the meaning of the word, "sick," as it was used in this sentence of Dr. Clement. Remember, we must take as true for the purposes of this motion the testimony of Paul Douglas Finkle.

The circumstances as set forth above reveal a man suffering from cancer and a heart condition who has made application for insurance. The examining doctor in a conversation with the agent said that "the applicant is a sick man." Immediately thereafter, the agent said, "put the policy through anyway." Now in what sense did the agent understand the word, "sick," when he said, "put the policy through anyway"? What does *anyway* mean as it is used in this sentence? It means, obviously, that despite the fact that the applicant should have been turned down, he was asking the doctor to pass the applicant. Surely, then Mr. Daly understood the word, "sick," to mean "very sick"; so sick in fact that the application should have been refused. And is not this very meaning to be attached ordinarily to the word, "sick," when it is used as it was used by Mr. Daly in reporting Dr. Clement's statement to Mr. Daly? Surely, if one says, "I feel sick today," he means that he is temporarily indisposed; but if he says, "I am a sick man," he means that he is quite ill.

Again, let us remember that Dr. Clement was talking about a man who was suffering from cancer and heart disease, despite his appearance of good health, and let us remember, too, that

Mr. Daly's use of the word, "anyway," in the sentence, "I told him to put the policy through anyway," certainly shows he understood the word, "sick," to mean so ill that the application should have been refused.

Now we assume that the insured's state of health at the time of the application was such that it was a breach of a condition of the contract and ordinarily would be a bar to recovery; however, it is the opinion of this court that the agent of The Western & Southern Life Insurance Company knew of the unfitness of the candidate for insurance through his conversations with Dr. Clement. And the law is well settled that notice to the agent is notice to the principal. In other words, if the condition of Mr. Finkle's health at the time of the application was known to the agent, it was then also known to the company, and the latter is thus estopped from raising defenses that it might otherwise have in that matter.

As it is said in 2 Ohio Jurisprudence (2d), 233, Section 163: "It is a well-established general rule, supported by abundance of authority everywhere, that the principal is chargeable with and bound by the knowledge of or notice to his agent received by the agent in due course of his employment, with reference to matters to which his authority extends, even though such knowledge or notice is not actually communicated to the principal."

So in the second paragraph of the syllabus of *First National Bank of New Bremen* v. *Burns*, 88 Ohio St., 434, 103 N. E., 93, 49 L. R. A. (N. S.), 764, it is said that: "A corporation can act only through its officers and agents, and the knowledge of such officers and agents in the transaction of the corporation's business within the scope of their authority become at once the knowledge of the corporation without any actual or presumptive communication from agent to principal."

And 2 American Jurisprudence, 286, Section 368, states the rule this way: "There is abundant authority supporting the general rule that the principal is chargeable with, and is bound by the knowledge of, or notice to, his agent received while the agent is acting within the scope of his authority and which is in reference to a matter over which his authority extends."

The general rule of knowledge of and notice to the agent is knowledge of and notice to the principal of course applies to

the agency relationship in insurance contracts. 30 Ohio Jurisprudence (2d), 685, 686, Section 748, elaborates in the matter thusly: ''The general rule of agency that the principal is chargeable with, and is bound by, the knowledge of or notice to his agent received while the agent is acting within the scope of his authority, and which is in reference to a matter over which his authority extends, is fully applicable to agents of insurance companies. The general rule of insurance law is that knowledge of, or notice to, an insurance agent as to a matter within the scope of his authority, and which is acquired while the agent is acting within the scope of his authority, is chargeable to the insurer. Stated differently, the agent's knowledge is in law the knowledge of the principal although such knowledge is not in fact communicated to the insurer.

''By imputing the knowledge of the agent of violations of policy conditions to the insurance company, the latter has the knowledge necessary to relinquish a known right under the theory of waiver. This rule of imputation of knowledge is not based upon the theory of actual notice, but rather on considerations of policy—namely, that where one seeks the advantages of doing business through general agents, fairness to the other party demands that the principal be in no better position than if he were transacting the business in person. Consequently, an applicant for insurance may assume that an insurance company issues his policy with knowledge of facts communicated in good faith to the agent. When an officer or employee of an insurance company having authority and discretion in the matter of the issuance of policies issues a policy with actual knowledge of the existence of facts which would avoid the policy under its terms, the company will be held to have waived its defense based upon such facts. * * *''

Thus, in *Fay, Admr.,* v. *Swicker,* 154 Ohio St., 341, 96 N. E. (2d), 196, it is said in the first paragraph of the syllabus: ''At common law, ordinarily the knowledge of an agent, received while he is acting within the scope of his authority and in reference to a matter over which his authority extends, is imputed to such agent's principal.''

Finally, 29A American Jurisprudence, 192, Section 1019, adds its authority as follows: ''The general rule of agency

that the principal is chargeable with, and is bound by, the knowledge of or notice to his agent received while the agent is acting within the scope of his authority, and which is in reference to a matter over which his authority extends, is fully applicable to agents of insurance companies.''

In the opinion of this court the conversation between the agent of the insurance company and the examining doctor was such that the minds of reasonable men could easily differ as to whether or not knowledge of a serious illness had been communicated to The Western & Southern Life Insurance Company itself, appellee herein.

This court is further of the opinion that in granting the motion of defendant for an arrest of judgment, the trial court was not following the law as it has been stated in this opinion; and that prejudicial error therefore resulted.

The judgment of the Court of Common Pleas is, therefore, reversed and the cause remanded for further proceedings according to law.

*Judgment reversed.*

MATTHEWS, P. J., and LONG, J., concur.