407 P.2d 685

Carol J. THEROS, Plaintiff and Appellant,

v.

METROPOLITAN LIFE INSURANCE COM-
PANY, a New York corporation,
Defendant and Respondent.

No. 10124.

Supreme Court of Utah.

Nov. 15, 1965.

Rawlings, Wallace, Roberts & Black, Warren M. Weggeland, Salt Lake City, for appellant.

Van Cott, Bagley, Cornwall & McCarthy, Grant H. Bagley, Salt Lake City, for respondent.

CALLISTER, Justice:

Andrew James Theros made written application for a life insurance policy with defendant insurance company through its agent, William Homer George, on May 28, 1960. The policy was issued without a medical examination, bearing date of July 1, 1960, and Theros died March 31, 1962 (within the two year contestable period contained in the policy). Plaintiff, widow of Theros and beneficiary under the policy, made claim with defendant who refused to honor it and she brought suit. From a summary judgment in favor of defendant, plaintiff appeals.

In its answer to plaintiff's complaint, defendant alleged that the deceased had falsely and knowingly given untrue answers to questions contained in the application for the purpose of inducing defendant to issue the policy and that defendant would not have issued the policy had it known the answers to be untrue. The questions referred to and the answers recorded were as follows:

2. How much time have you lost from work, school or normal activities in the past two years because of health? Answer: none.

   (a) Reasons and dates for time lost. Answer: none.

   (b) Name and address of each doctor consulted. Answer: none.

3. Have you ever had or been told that you had or been treated for or sought advice concerning:

   (a) Chest pain, disease of heart, arteries or other blood vessels? Answer: No.

4. Have you had health examinations or check-ups in the past five years?

(a) In the course of employment? Answer: No.

(b) Other than in the course of employment? Answer: No.

(i) Did you request examination because of symptoms or ailments? Answer: No.

(ii) Was any treatment, change in living habits, further examination or consultation, suggested or advised? Answer: No.

5. Have you had any electrocardiograms, x-rays, laboratory examinations, or other diagnostic tests within the past five years? Answer: No.

(If yes, indicate which and give reasons, dates, name and address of each doctor and each hospital, and results.) No response.

7. (a) Have you ever had a surgical operation, been a patient in or visited a hospital, clinic, dispensary or sanitorium for observation, examination or treatment of any condition or disease not described above? Answer: yes; Explanation: Tonsillectomy as a child about five years old. Fine now.

(b) Have you ever had a surgical operation, or been examined or advised by any physician or practitioner within the past five years for any condition or disease not described above? Answer: No.

The defendant alleged that, contrary to the foregoing answers, the true facts were: that on the 10th day of April 1959, the deceased was afflicted with heart disease and suffered an acute cardiac failure due to past rheumatic heart disease and thyrotoxosis; that he was sent to a hospital by his attending physician for medical care and treatment for said heart disease and was confined in the hospital for a period of nine days during which time he received care, attention and medical treatment. During said period, deceased was under the care and treatment of Dr. Pearse. In the course of such hospitalization, deceased was given numerous electrocardiograms, laboratory examinations and other diagnostic tests; that the deceased continued to suffer from the heart disease after his release from the hospital and remained under the care and treatment of Dr. Pearse up to the time of his death. He died on March 31, 1962 as the result of the heart disease. Deceased had been fully advised by the doctor of his affliction and told to refrain from any strenuous physical exertion.

At the pretrial hearing the deposition of defendant's agent, William Homer George, was ordered published. In this deposition, George testified that he had filled out the application and that he had, on his own initiative, inserted false answers although the deceased had given him truthful information. Based upon this deposition and the pleadings, plaintiff moved for summary

judgment. The lower court did not rule upon this motion and granted defendant's request to file an amendment to its answer.

In the amendment to its answer, defendant alleged that the deceased had informed George of his hospital confinement and treatment for heart disease. That both George and the deceased knew that if such information were given to defendant that it would not issue the policy without a medical examination and that the chances of the deceased passing such an examination were highly improbable. That George advised deceased, in effect, that it was necessary to make the false representations in the application in order to obtain the policy.

At a second pretrial conference, plaintiff moved to strike the amendment to defendant's answer and renewed her motion for a summary judgment. Both of these motions were denied and defendant's motion for summary judgment was granted.

Upon the record, and plaintiff does not contend otherwise, it appears that the answers contained in the application were untrue; they were material to the risk; the defendant believed and relied upon them; and the defendant, being deceived by them, would not have issued the policy had it known the truth—at least, not without a medical examination.

However, plaintiff's argument is to the effect that the fraud upon defendant was committed, not by Theros, but by the defendant's agent, George, and, therefore, it is denied the right to assert the fraud as a defense. It is plaintiff's position that Theros gave truthful answers concerning his health and medical history but that the agent incorrectly recorded them. In such an event, the agent's act is that of his principal and not that of the applicant and the knowledge of the agent is the knowledge of the insurance company.[1]

In the instant case, the application was signed by Theros in two places. His signature below the part relating to his health and medical history follows a printed statement: "I have read the foregoing answers before signing. They have been correctly written, as given by me, and are true and complete. There are no exceptions to any such answers other than as stated therein." This statement was in the same size type as the other printing in the application. Furthermore, a photostatic copy of the application was attached to the delivered policy and, by the terms of the policy, made a part thereof.

Whether Theros read the completed application is not ascertainable from the record. The agent's testimony in this regard is equivocable. He was unable to state with any degree of positiveness whether Theros read the application before signing it. The plaintiff, whose deposition was published, did not know.

1. Appleman, Insurance Law & Practice, Vol. 17, Sec. 9401.

In order to defeat recovery on an insurance policy because of misrepresentation in the application, the misrepresentations must have been made with an intent to deceive and defraud the insurance company. However, such an intent may be inferred where the applicant knowingly misrepresents facts which he knows would influence the insurer in accepting or rejecting the risk.[2] The same rule should apply where the applicant knowingly, or with constructive knowledge, permits such misrepresentations to be submitted to the insurance company.

The rule supported by the great weight of authority is to the effect that if an applicant gives truthful answers to the questions contained in the application, but they are falsely recorded by an agent of the insurer, then the latter cannot rely upon the falsity of such answers to avoid liability under the policy issued upon the application in the absence of fraud, collusion, actual knowledge of the insured or the existence of circumstances from which constructive knowledge of such falsity might be imputed to him.[3]

It is also the majority rule that an insured is under a duty to read his application before signing it, and will be considered bound by a knowledge of the contents of his signed application.[4] This is merely an application of fundamental contract law. While courts generally are inclined to treat insurance contracts as special and do not always vigorously apply all the principles of contract law, that tendency should not be allowed to overrun the bounds of legitimate exception.[5]

The facts here presented provide absolutely no basis for applying any exception to the basic contract law. The record is devoid of any facts or circumstances that would indicate or imply that Theros was by fraud, accident, misrepresentation, imposition, illiteracy, artifice or device reasonably prevented from reading the application before signing it. Therefore, he is, by law, conclusively presumed to have read the application and his beneficiary is bound by the contents thereof.[6] It therefore follows that the lower court should be affirmed.

In view of the foregoing conclusion, it is not necessary for the court to consider

2. See concurring opinion of Justice Mc-Donough, New York Life Ins. Co. v. Grow, 103 Utah 285, 135 P.2d 120 (1943).
3. 148 A.L.R. 508; Mutual Life Ins. Co. of New York v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202.
4. 148 A.L.R. 514.
5. Lawein v. Metropolitan Life Ins. Co., 211 Minn. 211, 300 N.W. 823 (1941).

6. Metropolitan Life Ins. Co. v. Coddington, 131 N.J.Eq. 430, 26 A.2d 41 (1942); Kasmer v. Metropolitan Life Ins. Co., 140 Pa.Super. 46, 12 A.2d 805 (1940); Prevete v. Metropolitan Life Ins. Co., 343 Pa. 365, 22 A.2d 691 (1941); Rhodes v. Mutual Benefit Health & Accident Assn., 62 Ga.App. 208, 8 S.E.2d 685 (1940); Telford v. New York Life Ins. Co., 9 Cal.2d 103, 69 P.2d 835 (1937).

the import of the fact that a copy of the application was attached to, and made a part of, the insurance policy issued and delivered to Theros.[7]

Affirmed. Costs to defendant.

HENRIOD, C. J., and McDONOUGH, J., concur.

CROCKETT, Justice (dissenting).

This is a summary judgment, and speaking generally about it, should be regarded as a stringent measure which deprives the plaintiff of an opportunity of presenting her case for trial by a court or a jury. Accordingly, it should be granted with reluctance and only when, taking the facts shown and all fair inferences to be drawn therefrom in the light most favorable to her, she could not establish a right to recover; and unless it clearly so appears, doubts should be resolved in favor of permitting her to go to trial.[1]

Speaking specifically about this case there are some other fundamentals which also should be kept in mind.

The showing that the policy was issued, the premiums paid, and that the insured had died, established, prima facie, the plaintiff's right to recover.

The defense that the issuance of the policy was procured by falsification and fraud is an affirmative one, the burden of proving which is upon the defendant; and being fraud, must be proved by clear and convincing evidence.[2] Therefore, the summary judgment could be justified only if all reasonable minds *must* believe that the defendant has shown by that degree of proof that Mr. Theros knowingly participated in falsifying the application. Conversely, if there is any basis in the evidence, or from lack of evidence, upon which reasonable minds could remain unconvinced of that fact, then there is a jury question and the summary judgment was improperly granted.[3]

This case would of course appear in a greatly different light if Mr. Theros had furnished the defendant's agent Mr. William Homer George any false information. But that is not what happened. The main opinion fairly and correctly points out that Mr. Theros gave the defendant's agent the true facts and that it was the latter who wrote down on the application the false statements concerning Mr. Theros' condition of health.

The critical question is this: Did Mr. Theros know that Mr. George put down

---

7. The majority view is that the insured is bound by misstatements appearing in an application attached to the policy delivered to and retained by him. Couch on Insurance, 2d Ed. 35:211; e. g., Hein v. Family Life Ins. Co., 60 Wash.2d 91, 376 P.2d 152 (1962).

1. See Morris v. Farnsworth Motel, 123 Utah 289, 259 P.2d 297.
2. Condas v. Adams, 15 Utah 2d 132, 388 P.2d 803.
3. See Tangren v. Ingalls, 12 Utah 2d 388, 367 P.2d 179.

the false statements, rather than the correct information he gave Mr. George, and knowingly participate in the falsification?

How is this question to be answered? Mr. Theros is dead and his testimony is unavailable. There are two sources to look to in order to determine what actually happened: (a) whatever deduction may be drawn from the fact that Mr. Theros signed the application; and (b) the testimony of the agent, Mr. George.

As to (a), the court decision states that from his signing of the application, in the absence of a showing of fraud, duress or something of that nature, the deceased is conclusively presumed to have read it. With deference to the view of my colleagues to the contrary, it is my opinion that an analysis of the situation here presented will reveal that the "presumption" referred to cannot properly be regarded as conclusive, and that it does not establish the fact so absolutely as to be incontestable. It should be kept in mind that the term "presumption" is merely descriptive of a process of reasoning in determining facts. It means that from the ascertainment of certain known facts, viewed in the light of common sense and experience, it is but reasonable to assume that other facts exist. Or perhaps more accurately, that other facts are probably true and can be assumed to be true unless the contrary appears.[4] I say probably because the presumed facts do not have to be regarded by a jury as certainly true if the evidence would reasonably permit a finding otherwise.[5] As has been aptly said, "Presumptions may be looked upon as the bats of the law, flitting in the twilight, but disappearing in the sunshine of actual facts." [6]

It is my view that the fact that the deceased signed the application shows prima facie that he had read it and knew that it contained false answers. This satisfied the defendant's burden of going forward with evidence; and *could* support such a finding. But this presumption by itself is not so absolute as to be irrefutable and does not compel such a finding regardless of all other considerations. The proposition which impresses me as being a vital and controlling importance here is that the defendant has the ultimate burden of persuasion to show by clear and convincing evidence that Mr. Theros knew of the falsification, and that consequently, as stated above, if there is any basis in the

4. Miller v. Commonwealth, 172 Va. 639, 2 S.E.2d 343.
5. E.g. the so-called absolute presumption of legitimacy of a child born in wedlock is based on considerations of public policy rather than absolute certainty as to the fact. Wigmore states that "In strictness, there cannot be such a thing as a conclusive presumption." Wigmore, Evidence, (3d Ed.) Sec. 2492; also deprecating the idea of absolute presumptions see discussion in Jones, Commentaries on Evidence, (2 Ed.) Sec. 42.
6. See Mackowik v. Kansas City, St. J. & C. B. R. Co., 196 Mo. 550, 94 S.W. 256.

evidence upon which reasonable minds could remain unconvinced of that fact, then the question of whether he knew of and participated in the falsification is for the jury. In making that determination we should look to the circumstances of the transaction as shown by the evidence and the fair inferences that may be drawn therefrom in the light of practical experience and viewed most favorable to the plaintiff, which evidence I shall refer to presently. But before doing so, I observe that if we were going to deal with this problem on the basis of presumption, there is also a valid presumption bearing on this issue which redounds to the benefit of the plaintiff: that a person engages in right conduct, rather than wrong conduct,[7] and the burden of proof that the deceased was guilty thereof rests upon the defendant here. Thus, this latter presumption would tend to offset the former and there remains the critical dispute of fact, the resolution of which must be sought in the evidence.

As to (b), beyond any question of presumption there is evidence relating directly to the question whether the deceased knew of the false answers: the testimony of the defendant's agent, Mr. George. While in one part of his testimony he made statements indicating that Mr. Theros knew the contents of the application, he also made statements to the contrary. That being so, it would be the prerogative of the fact-trier to determine which to believe.

Pertinent to that issue Mr. George stated:

Q. But you didn't hesitate to allow Mr. Theros to sign that application?

A. No, I didn't.

Q. Do you know, Mr. George, whether Mr. Theros read that last line or not? [that he had read the above]

A. *Most generally they don't read what is on the application. They just sign it when we hand it to them.*

Q. *Well, is that what occurred here?*

A. *Yes.*

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you make any statement to him as to what the application contained?

A. No, I didn't, other than ask the questions and fill them out the way I did.

I cannot see how the testimony just quoted can possibly be construed as indicating that Mr. Theros knew of the falsity of the application, much less that it is clear and convincing evidence there-

---

7. See statement in Boyle v. Baggs, 10 Utah 2d 203, 350 P.2d 622; also 20 Am.Jur., Evidence, Sec. 229.

of. Very much to the contrary, *it can be taken as an affirmative statement by defendant's own agent that Mr. Theros did not read the application.*

There are certain other aspects of the situation which could be considered as supporting the conclusion just stated. Mr. George's deposition shows that Mr. Theros already had insurance in force with the company. Upon the latter's inquiry, Mr. George advised him that he could get $10,000 additional insurance without a medical examination. Mr. George had a self interest to serve in getting the application accepted for the purpose of writing the business and obtaining his commission. As his testimony suggests, lay people are disinclined to read long legal documents or to concern themselves with the details therein, but often repose trust in the person with whom they are dealing, particularly where as here, there has been prior satisfactory dealings between them. Mr. George's lack of scruples in the matter is obvious. He admits being faithless to the trust of his employer. Why then, must it be assumed that he was so honest in making disclosures to Mr. Theros? From these things it would not be unreasonable for the jury to believe that for his own ulterior purposes he so managed the filling out of the application and the obtaining of Mr.

Theros' signature thereon as to conceal what he was doing from Mr. Theros, just as he concealed the true facts from his company. Thus the evidence in my judgment falls short of the requisite compelling proof that the deceased knew of the false answers and participated in the falsification of the application.

It is also significant that it was the defendant company which chose Mr. George and made him its agent to do the very thing he was doing in taking this application. So what he did was certainly within the scope of his authority as intended by the company. Whatever information he obtained while acting within the scope of his authority is imputed to it.[8] It might just as well have been given to its president or board of directors. The company is deemed to have that knowledge, but nevertheless issued the policy and accepted the premiums thereon.

As in most every lawsuit there are commingled with the application of legal principles considerations of equity and justice in the particular fact situation. One side of the coin here is that the company may be held responsible to pay the proceeds of this policy issued upon an application containing false answers. But there is another side of this coin. In addition to the fact that this was done by its own agent, there

8. See Van Ross v. Metropolitan Life Insurance Company, 134 Kan. 479, 7 P.2d 41, 81 A.L.R. 821; Bednarek v. Brotherhood of American Yeoman, 48 Utah 67, 157 P. 884; Finkle v. Western & Southern Life Insurance Company, 111 Ohio App. 407, 172 N.E.2d 311.

is the fact that the deceased desired and was willing to pay for additional insurance. Upon being advised that he could get $10,000 more insurance without a medical examination, he furnished the correct information to the defendant's agent, obtained the policy and paid the premiums thereon. The Theroses undoubtedly relied upon the fact that this fulfilled their need for additional insurance coverage. Except for the issuance of this policy and the acceptance of the premiums they may have taken another course: by either submitting to a physical examination or by applying to defendant or another insurance company for a rated up insurance policy to obtain this coverage. Is it just and equitable to permit the defendant company to issue the policy, accept the premiums, and because deceased died and liability occurred, permit it to repudiate the policy because of falsification by its own agent and leave the plaintiff without the coverage she and her husband relied on and the company represented she had?

Upon the basis of the considerations hereinabove discussed, it is my opinion that there exists such uncertainty with respect to the facts upon which liability depends, that the issues should be submitted to a court or jury, whose prerogative it is to determine questions of fact.

WADE, J., concurs in the dissenting opinion of CROCKETT, J.